**Ronald Keith WILLIAMSON, Petitioner,**

v.

**Dan REYNOLDS, Warden, Oklahoma State Penitentiary, Respondent.**

No. Civ. 94–539–S.

United States District Court, E.D. Oklahoma.

Sept. 19, 1995.

Janet Chesley, Vicki Ruth Adams Werneke, Assistant Federal Public Defender, Death Penalty Federal Habeas Corpus Division, Oklahoma City, OK, for petitioner.

Sandra D. Howard, A. Diane Blalock, Office of the Attorney General, Susan Brimer Loving, Attorney General, Oklahoma City, OK, for respondent.

## ORDER GRANTING WRIT OF HABEAS CORPUS

SEAY, Chief Judge.

Petitioner was convicted of First Degree Murder and condemned to death in 1988 by the District Court of Pontotoc County, Oklahoma.[1] On direct appeal, the Oklahoma Court of Criminal Appeals affirmed Petitioner's conviction and death sentence. *Williamson v. State*, 812 P.2d 384 (Okla.Crim.App. 1991), *cert. denied*, 503 U.S. 973, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992), *reh'g denied*, 504 U.S. 968, 112 S.Ct. 2325, 119 L.Ed.2d 244 (1992). Petitioner filed an Application for Post–Conviction Relief before the District Court of Pontotoc County which was denied by that court on the 18th day of September 1992. The Oklahoma Court of Criminal Appeals affirmed the trial court's Denial of Post–Conviction Relief. *Williamson v. State*, 852 P.2d 167 (Okla.Crim.App.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2122, 128 L.Ed.2d 677 (1994).

Petitioner now seeks relief from his death sentence pursuant to 28 U.S.C. § 2254 asserting that his conviction and death sentence were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Petitioner has not previously sought habeas corpus relief in federal court.

The facts, according to the trial record, are presented here as follows. On December 8, 1982, twenty-one-year-old Debbie Carter was found dead in her garage apartment in Ada, Oklahoma. She was discovered by her father, who had come to check on her at her mother's request, fearing that something might be wrong. Walking up the stairs to the second floor apartment, Mr. Carter observed glass on the landing and saw the screen door and front door standing wide open. Continuing through the apartment to the bedroom, he found Debbie's body lying face down on the floor with a washcloth stuck in her mouth. The police were called, and the investigation into the murder began.

Detective Dennis Smith of the Ada Police Department was among the first to arrive at the scene. He testified at trial that the apartment showed signs of a struggle. Broken glass was found both inside and outside the front door. In the living room, the sofa cushions and a nightgown were on the floor. On the wall, written in what was later determined to be fingernail polish, were the words, "Jim Smith next will die." On top of the kitchen table was written, "don't look fore [sic] us or ealse [sic]." Approaching the bedroom, he found the bed blocking entry into the room. The room was in complete disarray with clothing, sheets, blankets and stuffed animals on the floor. Debbie Carter's body, nude except for a pair of white socks, was on the floor between the bed and the wall. Written on her back in catsup were the words "Duke Graham." The word "die" was written on her chest in fingernail polish. A blood-soaked washcloth was stuffed into her mouth and down into her throat. Underneath the body was an electric cord and a belt. The bathroom, connected to the bedroom, showed no signs of a disturbance.

---

1. This is at least the third murder conviction in Pontotoc County, Oklahoma, from 1985 through 1988 which was based upon an alleged "dream confession" and circumstantial evidence and which resulted in the death penalty. *See Fontenot v. State*, 742 P.2d 31 (Okla.Crim.App.1987), *appeal after new trial*, 881 P.2d 69 (Okla.Crim. App.1994); *Ward v. State*, 755 P.2d 123 (Okla. Crim.App.1988); *State ex rel. Peterson v. Ward*, 707 P.2d 1217 (Okla.Crim.App.1985). *See also* Robert Mayer, *The Dreams of Ada*, 37–38 (1987).

Four years and five months later, on May 8, 1987, Petitioner and Dennis Fritz were charged with the murder of Debbie Carter. Separate trials were held, and approximately two weeks before Petitioner's trial began, Dennis Fritz was found guilty and sentenced to life imprisonment. The following is a time line of significant dates:

1. 12/08/82 Murder

2. 12/09/82 Autopsy

3. 03/14/83 Detective interviewed Petitioner at his mother's home. Mother gave alibi, saying Petitioner was home by 10:00 p.m. Petitioner gave hair and saliva samples.

4. 11/09/83 Videotape of Petitioner denying involvement in murder of Debbie Carter.

5. 10/01/84–01/23/85 Petitioner allegedly overheard making incriminating statement by fellow inmate Terri Holland in Pontotoc County jail. Petitioner was in county jail during this time on unrelated charges.

6. 08/21/85 In the unrelated case Dr. Charles W. Amos determined Petitioner was not competent to understand the charges against him or to consult with his attorney.

7. 09/26/85 District Court of Pontotoc County judicially determined Petitioner was mentally ill and unable to assist counsel in the unrelated case.

8. 10/30/85 Dr. R.D. Garcia gave opinion Petitioner was competent to stand trial in the unrelated case.

9. 02/86 Terri Holland was called into Seminole County DA's Office during this month. She agreed to pay $800.00 in restitution for some bad checks she had passed earlier.

10. 02/86 Terri Holland first informed DA of alleged confession by Petitioner made in winter of 1984–1985.

11. 05/01/87 Victim's body exhumed; OSBI matched palm print at crime scene to those of the victim.

12. 05/08/87 Felony charges filed against Petitioner.

13. 05/09/87 Petitioner interviewed by OSBI agent and allegedly related dream confession.

14. 05/22/87 Petitioner allegedly related second dream about murder to John Christian, employee of Pontotoc County Sheriff's Department.

15. 06/01/87 Trial counsel appointed to represent Petitioner.

16. 06/03/87 Letter from parents of Glen Gore's victim filed in case against Gore.

17. 07/87 Petitioner allegedly overheard by fellow inmate Cindy McIntosh in Pontotoc County Jail after preliminary hearing discussing photographs of victim with co-defendant Dennis Fritz.

18. 09/24/87 Ricky Simmons confessed to the murder of Debbie Carter.

19. 12/14/87 Petitioner filed pretrial motion to dismiss for lack of speedy trial. Motion was overruled.

20. 04/12/88 Trial of co-defendant Dennis Fritz concluded.

21. 04/20/88 Notice of Evidence in Support of Aggravators filed; no record of receipt by Petitioner's counsel.

22. 04/21/88 Petitioner's trial commenced.

23. 04/27/88 Jury found Petitioner guilty of Murder in the First Degree.

24. 04/28/88 Second stage of trial set punishment at death.

25. 04/29/88 Hearing on *Brady* issue regarding 1983 Videotape (48 hours after guilty verdict returned).

26. 05/19/88 Judgment and Sentence on Conviction filed in the District Court of Pontotoc County, Oklahoma.

Petitioner asserts seventeen grounds for relief. Respondent filed a response by and through the Attorney General for the State of Oklahoma. In addition, pursuant to the order of this court, Respondent and Petitioner provided the court a complete record of the trial court proceedings which includes a transcript of the trial in Case No. CRF–87–90 and transcripts of the evidentiary hearings and hearings on motions.

The court has reviewed (1) the Petition for Habeas Corpus; (2) the response to the petition filed by the State of Oklahoma; (3) the trial transcript in Case No. CRF–87–90; (4) the preliminary hearing transcript; (5) the transcripts of the hearings on motions and

evidentiary hearings; and (6) the records before the Oklahoma Court of Criminal Appeals, including all state court docket sheets. As a result, this court finds that the records, pleadings and transcripts of the state proceedings provide all the factual and legal authority necessary to resolve the matters in the petition and, therefore, an evidentiary hearing is unnecessary. *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992); *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) (*Sumner I*); *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (*Sumner II*). Because Petitioner's competency is the threshold issue, this court will first examine that claim.

## I. COMPETENCY

### A. Ineffective Counsel

Ineffective assistance of counsel claims may fall into two categories. First are claims that the defendant was deprived of his right to effective assistance of counsel because counsel simply failed to provide adequate legal assistance. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984). Claims in the first category are called "actual ineffectiveness claims." *Id.* Second are claims that the government violated the defendant's right to effective assistance of counsel by impermissibly interfering with counsel's ability to make independent decisions about how to conduct the defense. *Id.* Petitioner has raised both types of claims in his Petition.[2]

To prove counsel's performance was deficient under an "actual ineffectiveness" claim, Petitioner bears the burden of meeting the two-prong test of *Strickland.* In *Strickland* the United States Supreme Court held that a defendant must show: (1) "that counsel's performance was deficient" with reference to prevailing professional norms, and (2) "that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. at 2064; *United States v. Rivera,* 900 F.2d 1462, 1472 (10th

Cir.1990). Prejudice is shown by demonstrating "there is a reasonable probability that, *but for* counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068 (emphasis added); *Rivera,* 900 F.2d at 1472. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070.

■ This review must be approached with considerable restraint. As the Supreme Court noted in *Strickland:*

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

*Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Petitioner argues he was denied effective assistance of counsel during the first stage of trial by counsel's failure to fully investigate and utilize evidence of Petitioner's mental illness.

### Evidence of Mental Illness

Petitioner has been observed and treated for mental illness since 1979. He has been diagnosed as displaying behavior indicative of schizophrenia, Bipolar Disorder, Borderline Personality Disorder, and Paranoid Personality Disorder, as well as other types of personality disorders. However, in spite of his lengthy history of mental illness and an actual judicial determination of his incompetency in the same district court in an unrelated case two and one-half years earlier, the competency of Petitioner to stand trial in this case was never determined.

■ Petitioner's counsel was aware of some of Petitioner's mental illness problems. His stated reason for not pursuing this issue was that Petitioner had already been found competent in 1985 in another criminal pro-

---

2. The court finds that the issue of governmental interference due to the State's nondisclosures affects Petitioner's ineffective counsel claim.

However, that issue is addressed in Part IV, *Brady* Issues, rather than in this section.

ceeding, and none of the mental health professionals of whom he was aware had indicated Petitioner did not know right from wrong (Pet., App. K, Affidavit No. 6). This statement reveals that counsel's decision was based on both inadequate information and a misconception of the law. The test to determine competency of a criminal defendant's ability to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *see also Lafferty v. Cook,* 949 F.2d 1546, 1550–56 (10th Cir.1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992) (a defendant must have a rational as well as actual understanding of the proceedings against him); *Ake v. State,* 778 P.2d 460, 464 (Okla.Crim.App.1989).

Counsel outlines by affidavit three documents he relied upon to decide whether he would raise the issue of Petitioner's competency: (1) a letter dated October 1, 1985, and signed by Dr. Garcia, the then Chief Forensic Psychiatrist at Eastern State Hospital concerning Petitioner's competency in a prior, unrelated case; (2) A letter from Norma Walker, a social worker with Mental Health Services of Southern Oklahoma; and (3) A psychological report prepared by Claudette S. Ray, M.S., the Clinical Director of the Guidance Clinic of the Pontotoc County Health Department. Counsel further states in his affidavit, "I collected no other documentation regarding Mr. Williamson's psychiatric history." (Pet., App. K, Affidavit No. 6).

### The Psychological Report by Dr. Garcia

On September 26, 1985, approximately three years before Petitioner's trial in this case a special district judge for the District Court of Pontotoc County, Oklahoma, found Petitioner mentally ill and unable to assist counsel (Pet., App. J, Index 7). Petitioner had been charged with escape from house arrest for a bogus check conviction. The judge in that case officially adjudged and decreed Petitioner unable to appreciate the nature of the charges against him, consult

with his counsel or rationally assist in his defense. *Id.* The court further found that he "is a mentally ill person or persons requiring treatment as defined by Oklahoma Statute Title 43A Section 3 ..." *Id.* The court based its findings on an evaluation by Dr. Charles W. Amos and "in court observation of defendant ..." *Id.*

Dr. Amos evaluated Petitioner approximately one month before the district court made these findings and noted that Petitioner was admitted for evaluation of his competency to stand trial on the escape charge (Pet., App. J, Index 6). Dr. Amos found Petitioner was not competent either to appreciate the charges against him or consult with his attorney. An evaluation indicated Petitioner was probably "delusional." Dr. Amos recommended Petitioner's transfer to Eastern State Hospital for evaluation. *Id.*

Pursuant to Dr. Amos's recommendation, the District Court of Pontotoc County ordered Petitioner to Eastern State Hospital for evaluation (Pet., App. J, Index 7). Petitioner was under observation at the hospital from September 30, 1985, through October 30, 1985 (Pet., App. J, Index 8). At the end of the commitment period, on October 30, 1985, approximately one month after the district court made the judicial determination of incompetency, R.D. Garcia, M.D., gave his opinion that Petitioner was competent to stand trial, but prescribed Thorazine, Dalmane, Ristoril, Duadacin, and Mellaril. Dr. Garcia also noted disturbed/psychotic behavior, diagnosed Borderline Personality Disorder, and found Petitioner was a "sociopath." Dr. Garcia released him to stand trial, but recommended he take 100 mg. of Thorazine four times a day. *Id.*

After Eastern State Hospital discharged Petitioner, legal proceedings resumed without further inquiry into his competency. The district court did not hold a post-examination competency hearing to determine Petitioner's competency to stand trial. Thus, counsel's reliance on Dr. Garcia's evaluation of Petitioner is unreliable, because that evaluation was conducted more than two years before the trial in this case. In addition, an opinion by a psychiatrist does not alter an earlier judicial ruling that a person is incompetent.

The Pontotoc court's initial incompetency determination and the findings of Dr. Amos were available to counsel at the time of Petitioner's trial.

### The Letter from Norma Walker

Counsel also had in his possession a letter dated July 16, 1987, from Ms. Norma Walker, a social worker with Mental Health Services of Southern Oklahoma (Pet., Appendix J, Index 10). In her letter Ms. Walker outlined the information contained in Petitioner's chart with that institution, including the various times he had utilized the services of that facility since 1980, the professionals he had seen there, the drugs he had been prescribed, and other institutions where Petitioner had received treatment. In this letter Ms. Walker states:

> This client has been suspected by each counselor who saw him of shamming, malingering, [or] attempting to manipulate the system. The known abuse of alcohol and drugs complicates the picture. There may be neurological damage or organic brain syndrome. Or the client may know how to feign thought disorder. *As an outpatient facility we are not equipped to rule out those conditions. He needs a complete neurological evaluation by experienced professionals in an inpatient facility. This is the only way to obtain a differential diagnosis in this case, in my opinion.*

*Id.* (emphasis added).[3] Despite direct knowledge of Ms. Walker's assessment, trial counsel ignored Petitioner's need for a neuropsychological evaluation by experienced professionals. The fact that Petitioner never had this evaluation is particularly troubling in light of the fact that Ms. Walker herself stated her facility was not qualified to adequately assess Petitioner's condition.

Another letter also written by Ms. Walker approximately three months later, dated October 21, 1987, states:

I last saw Ron Williamson on February 20, 1987, and he was not capable of managing his daily living activities. He was greatly impaired in his ability to make reasonable life decisions. He was disoriented to time, was impaired in attention span, abstract thinking and level of consciousness. He was at times delusional, also showing an associational disturbance and confused thinking. He showed very poor judgment and was not taking care of his own needs for food or shelter.

He was unmedicated at that time, and refused to take medication. Even when he had been on medication, he was quite unrealistic in his expectations of how others would act. *His perceptions of reality were seriously distorted.*

He would be unable to care for himself without being medicated, and would be hard to manage, even with medication. From my experience, *I expect him to need long-term institutionalization for his diminished mental capacities and unmanageable behavior.*

(Pet., App. K, Affidavit; Letter No. 10) (emphasis added). It is not apparent from the record whether this letter was in counsel's possession. However, Ms. Walker does state in her affidavit that she would have been "willing to assist and cooperate with Mr. Williamson's defense in the prosecution of murder charges filed against him in May of 1987, and tried in April of 1988, if [she] had been contacted by Mr. Williamson or his attorney or some other authorized representative." *Id.* It is, therefore, apparent from the record that information in this letter would have been available to Petitioner's counsel if he had contacted Ms. Walker.[4]

### The Psychological Report by Claudette S. Ray, M.S.

The third document in the possession of trial counsel was a psychological report dated

---

**3.** The court notes that after careful review of Petitioner's medical records, there is no written reference to a suspicion of malingering by anyone who ever treated Petitioner to substantiate this isolated statement by Ms. Walker.

**4.** The Court of Criminal Appeals was supplied this letter and other affidavits when the record

was supplemented on appeal. The court states that this letter "directly contradicts the earlier report provided to trial counsel." *Williamson v. State,* 812 P.2d 384, 414 (Okla.Crim.App.1991). However, this court finds substantial similarity between conclusions reached by the author.

October 5, 1987, and prepared by Claudette S. Ray, M.S., the Clinical Director of the Guidance Clinic of the Pontotoc County Health Department (Pet., App. K, Affidavit; Psychological Report No. 9). Ms. Ray states in pertinent part:

Ron is consciously anxious due to situational stress. He feels helpless to alter his situation or better himself. He may behave inappropriately, such as not attending preliminary hearings which would benefit him, because of his panic and confused thinking. Most individuals would be demanding to hear information and opinions that would influence their future life or death.

*Id.* These documents clearly indicate a problem which should have alerted counsel that further investigation was necessary before he made the critical decision either to proceed to trial or forgo an insanity defense.[5] Further, if counsel indeed visited with members of Petitioner's family, as found by the Court of Criminal Appeals, *Williamson,* 812 P.2d at 413, he would have discovered the information contained in their affidavits attached to this Order. "[I]n a capital case the attorney's duty to investigate all possible lines of defense is strictly observed." *Coleman v. Brown,* 802 F.2d 1227, 1233 (10th Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987), *reh'g denied,* 483 U.S. 1034, 107 S.Ct. 3279, 97 L.Ed.2d 783 (1987). *See also Brecheen v. Reynolds,* 41 F.3d 1343 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2564, 132 L.Ed.2d 817 (1995); and *Thomas v. Kemp,* 796 F.2d 1322 (11th Cir.1986), *cert. denied,* 479 U.S. 996, 107 S.Ct. 602, 93 L.Ed.2d 601 (1986). "Counsel has a duty to make reasonable investigations or to make reasonable decisions that make particular investigations unnecessary." *Strickland v. Washington,*

466 U.S. at 690–91, 104 S.Ct. at 2066. Trial counsel here did not meet these rudimentary constitutional standards. A cursory review of the medical records of Petitioner would have revealed the following excerpts:

1. **December 3, 1979 St. Anthony Hospital, Oklahoma City, OK**

 Actually this boy has demonstrated rather bizarre and sometimes psychopathic behaviour [sic] whether he is manic as the counselor in Ada thought or a schizoid individual with sociopathic trends, or the reverse, sociopathic individual with schizoid trends may never be determined.... Long term treatment may be required but he does not feel he needs treatment for schizophrenia....

 (Pet., App. J, Index 1).

2. **November 3, 1980, to December 15, 1980 Mental Health Services of Southern Oklahoma**

 Initial Diagnostic Impressions: Alcohol Addiction and Unspecified Drug Dependence. Referred to Bridge House for treatment for alcoholism.

 (Pet., App. J., Index 2).

3. **November 6–9, 1981 Central State Hospital, Norman, Oklahoma**

 Diagnosis: Dysthymic Disorder and alcohol abuse. Initial Treatment Plan: Chemotherapy and counseling.

 (Pet., App. J., Index 3).

4. **November 16, 1981, to February 11, 1982 Mental Health Services of Southern Oklahoma**

 Discharge Diagnostic Impression: (DSM–II) 300.4.

 Prognosis: Fair, suicidal ideation.

 showing an associational disturbance and confused thinking.
 It is not possible to tell when the claimant became sufficiently impaired as to be classified as disabled because of his mental impairments, but the evidence of record would indicate that it did occur on or prior to the time that the claimant last met the listings on March 31, 1985....
 (Petition, App. J, Index 13).

---

5. Additionally, counsel was aware that Petitioner had been awarded Social Security Disability benefits due to his mental illness on November 9, 1987, while he was awaiting trial in the instant case (Petition, App. K, Affidavit No. 6). The Administrative Law Judge made the following findings:

 ... There are repeated episodes of disorientation to time, impaired attention span, as well as impaired abstract thinking and level of consciousness. He is at times delusional, also

Medications prescribed: Asendin 50 mg. × 100 on T.i.d.

Recommendations: Needs more psychotherapy

(Pet., App. J, Index 4).

5. *June 30, 1983, to July 6, 1983 Mental Health Services of Southern Oklahoma (Valley Hope Association)*

This man may be exhibiting a cry for help or he may have answered the questions in a rather random fashion. It is possible of course that he is quite disturbed and the counselor should look for psychotic symptomatology. If the profile is of some validity, we can look for a great deal of emotional turmoil.... This individual is one who would accept little responsibility for his own behavior and he is likely to strike out in anger or hostility as a defense against being hurt. He sees the world as a very threatening and scary place and defends himself by being hostile or being withdrawn. Ron seems very immature and will present a picture of one who is rather unconcerned. In looking at the sentence completion test, one might assume that Ron took the test in a rather cynical and unconcerned fashion and perhaps did not mark the answers to the MMPI statements with any degree of rational thought.

Diagnostic Impression: Alcohol Dependence

Schizophrenic Disorder

Mixed Personality Disorder

Prognosis: Poor

(Pet., App. J, Index 5).

6. *August 21, 1985 Mental Health Services of Southern Oklahoma*

His intellectual functioning seems average, but he displays an impaired level of consciousness. He was oriented to person, place, and time. Insight is poor based on past admission records. He is most likely delusional at this time. It should be pointed out that this examiner's interview with Mr. Williamson shows a marked deterioration of emotional function since our last encounter in 1982.

Diagnosis (DSM III)

Axis I (1) Alcohol Dependence

(2) Unspecified Substance Dependence

(3) Atypical Psychosis

Conclusions and Recommendations of Dr. Charles W. Amos:

Based on Mr. Williamson's current mental status it is felt that he cannot be evaluated on an outpatient basis. It is recommended that he be transported to Eastern State Hospital for inpatient observation and evaluation.

(Pet., App. J, Index 6).

7. *September 26, 1985 District Court of Pontotoc County, Oklahoma*

After a review of the evaluations made by Charles W. Amos M.D. from the Mental Health Services of Southern Oklahoma, Ada, Oklahoma, previous testimony and the court's in court observation of defendant, the Court finds:

(1) That the defendant is not able to appreciate the nature of the charges against him;

(2) That the defendant is not able to consult with his lawyer and rationally assist in the preparation of his defense;

(3) That the defendant may be able to attain competency within a reasonable time if provided with a course of treatment, therapy, or training;

(4) That the defendant is a mentally ill person or a person requiring treatment as defined by Oklahoma Statute Title 43A Section 3; and

(5) The defendant, if released without treatment, therapy, or training, would probably pose a significant threat to the life or safety of himself or others.

Therefore, the court orders that the defendant be committed to custody of the Department of Mental Health to receive treatment, therapy, or training as specified by Eastern State Hospital....

(Pet., App. J, Index 7).

8. *September 30, 1985, to October 30, 1985 Eastern State Hospital, Vinita, Oklahoma*

Conclusions and Recommendations by R.D. Garcia, M.D. issued to the District

Court of Pontotoc County approximately one month after that court's order:

He is a sociopath and has history of alcohol abuse. He must continue to take Thorazine, 100 m.g. tablet, four times a day.

Diagnosis: Alcohol Abuse with psychotic features, in remission with chemotherapy. Uncomplicated bereavement; Borderline personality disorder.

Dr. Garcia opined that Petitioner was competent to stand trial.

(Pet., App. J, Index 8).

9. *October 15, 1986 through January 27, 1987 Mental Health Services of Southern Oklahoma*

Progress Notes:

12–9–86 Diagnosis Bipolar illness, manic phase

12–16–87 Sister called; Ron psychotic, won't come home....

12–20–87 Just before 2 p.m., sister called asking to see me with Ron and her husband, Marlin. Saw the three of them. Annette wanted to know what to do. Gave her options. Ron refuses to go voluntarily, not yet psychotic enough to be committed. Holds together in speech for brief periods, changes mind frequently, obvious difficulties at times in finishing thoughts. Sometimes holds mouth open and stares.... (Suspect possible petit mal seizures.) ... He is not yet incoherent, does exhibit extremely poor judgment and agitated behavior. Sister reports talk of suicide by gun. He will probably be violent when an attempt is made to E.O.D. him.

1–27–87 Letter from Norma Walker:

Ron Williamson has been a client of MHS/SO four times, the most recent admission being on 10–15–86. He had just been released from prison and was stable on Lithium.... We do not know where he is nor what condition he is in. Without meds, he is belligerent, abusive, physically violent, has religious delusions and a thought disorder....

(Pet., App. J., Index 9).

10. *November 9, 1987 Department of Human Services*

Granted Disability Benefits due to mental disorder.

(Pet., App. J, Index 13).

11. *February 28, 1987, to March 24, 1987 Central State Hospital, Norman, Oklahoma*

Initial Psychiatric Diagnosis:

Axis I: Mixed Substance Abuse, Continuous

Alcohol Abuse, Episodic

Rule out Cyclothymic Disorder v. Major Affective Disorder, mixed type

Axis II: Mixed Personality Disorder

Axis III: No diagnosis.

Prognosis: Guarded

Final Diagnosis:

Axis I: Major Affective Disorder, Mixed Type Mixed Drug and Alcohol Abuse, Continuous

Axis II: Mixed Personality Disorder

Axis III: No Diagnosis

(Pet., App. J, Index 14).

12. *June 1987 through 1988 Mental Health Services of Southern Oklahoma*

Role Performance Profile:

Major Role Functionality: Grossly Impaired

Personal Independence: Grossly Impaired

Social Interdependence: Grossly Impaired

Social Appropriateness: Grossly Impaired

Global Role Functioning Scale: Grossly Impaired

(Pet., App. J., Index 10).[6]

13. *September 29, 1989 Eastern State Hospital, Vinita, Oklahoma*

Letter dated 9–28–89 from John M. Marsh, M.D., Chief Staff Physician to Alex Lizarraga, M.D., Eastern State Hospital:

---

6. The medical records after the judgment entered on May 19, 1988, are pertinent to this issue only as they relate to information available to counsel at the time of trial.

In the past, he has had psychiatric diagnosis of atypical bipolar disorder and schizophrenia and has been treated with Lithium, Navane, Artane and Thorazine on various occasions. Currently, he takes Mellaril 100 m.g. HS.

His behavior, while at Oklahoma State Penitentiary is varied to relatively stable condition, with and without medications, to periods of rather striking depression and periods of hyperactivity and irritability with some mania.... In early September, he became depressed and developed progressive withdrawal, finally assuming a fetal position lying on his bunk and responding poorly to efforts of communication with others.... His diagnosis is unclear at this time, though he may represent an atypical bipolar disorder.... Thank you very much for seeing this patient.

Progress notes from Eastern State Hospital:

9–29–89 Potential of danger to self due to verbal threats and previous self-inflicted gestures -ie- lacerations to forearm and wrist and May 89 burned left ankle and foot unable to function at DOC setting. Upon admission to ward—placed on minimal suicide precautions....

10–9–89 The patient has been very despondent since his incarceration approximately 16 months ago on a first degree murder conviction out of Pontotoc County. The patient has reportedly attempted suicide on several occasions at OSP. The patient did not report hallucinations during his stay at OSP, *but family members have reported earlier occurrences of visual hallucinations just prior to the patient's arrest in 1988* [sic].... While at OSP, the patient was on medication consisting of Mellaril, 100 mg., at h.s. In the past, the patient has been treated with Lithium, Navane, Artane, and Thorazine on various occasions (emphasis added).

(Pet., App. J, Index 11).

14. *1992–1994 Special Needs Unit Oklahoma State Penitentiary, McAlester, Oklahoma*

Progress Notes:

1–5–93 Brought to IHCC complaining of heart attack.... Rambling speech pattern wants staff to kill him or get someone else to do it....

8–10–94 A brief meeting with him ... he wants all his medications discontinued ... he claims its [sic] a waste of time and effort. I tried to convince him to adjust it, or change it, but he refused. Unable to convince him, dysphoric behavior.

(Pet., App. J, Index 12).

In addition to his duty to investigate, counsel also had a continuing obligation to ask that the proceedings be suspended, if he became aware of "facts sufficient to raise a doubt as to the competency" of Petitioner during any stage of the criminal proceedings. Okla.Stat. tit. 22, § 1175.2 reads:

No person shall be subject to any criminal procedures after he is determined to be incompetent.... The question of the incompetency of a person may be raised by the person, *the defense attorney,* or *the district attorney* by an application for determination of competency. The application for determination of competency shall allege that the person is incompetent to undergo *further proceedings,* and shall state facts sufficient to raise a doubt as to the competency of the person....

(emphasis added). Section 1175.1 defines "Criminal Proceedings" as *every stage of a criminal prosecution after arrest and before judgment,* including, but not limited to, interrogation, lineup, preliminary hearing, motion dockets, discovery, pretrial hearings and trial ..." (emphasis added). Therefore, it is apparent counsel's obligation to initiate competency proceedings continues until judgment is entered, and failure to initiate a competency hearing may result in a deprivation of due process.

When ... no state court competency hearing has been held and the defendant has proceeded to trial without such a hearing, the issue is *not* whether the state court record supports a finding of competency. Rather the inquiry on habeas is whether [defense counsel] ... denied the defendant his right to due process by ignoring evidence, including evidence at trial, indicating that the defendant might not be com-

petent, and that a hearing to ascertain competency was therefore required. Evidence of a defendant's trial demeanor is of course relevant in making this assessment because [defense counsel's] ... duty to inquire as to competency continues through trial.

*Lafferty v. Cook,* 949 F.2d 1546, 1555 n. 10 (10th Cir.1991) (emphasis in original).

The record contains the following information which this court finds was sufficient to raise doubt as to Petitioner's competency and triggered counsel's duty to investigate, request that the proceedings be suspended and apply for a determination of competency pursuant to Okla.Stat. tit. 22, § 1175.2.

First, the court finds relevant the statements and opinions of counsel as set forth in his own affidavit:

> ... I had significant difficulties in dealing with Mr. Williamson. Mr. Williamson behaved well enough when I visited him at the jail, although I did hear stories from the jailers about incidents of unusual behavior. However his conduct at court appearances was atrocious and unpredictable. At virtually every appearance there was some kind of outburst from Mr. Williamson.... At the preliminary hearing Mr. Williamson became so incensed that he turned a table over on my secretary and Greg Saunders, counsel for Dennis Fritz. At that point Mr. Williamson had to be removed from the courtroom. The preliminary hearing lasted for several days and the magistrate gave Mr. Williamson more than one opportunity to return to the proceedings, but Mr. Williamson always refused. As a result he missed the entire preliminary hearing....
>
> [A]t the jury trial he continued to be disruptive. He argued with the prosecutor and the witnesses in front of the jury, and made a poor argumentative witness. Because of my previous experience with Mr. Williamson I had expected some trouble, and consequently I arranged to have my son sit behind me during the trial with instructions to bring him to the ground if he made any sudden move toward me. On the whole I found my representation of Mr. Williamson to be an extremely un-

pleasant experience and I was glad to get this case over with....

> I was aware that Mr. Williamson was receiving medication in the Pontotoc County Jail, and was receiving medicine through Dr. Marie T. Snow, a local psychiatrist associated with Mental Health Services of Southern Oklahoma. On occasion the jailers would call me when Mr. Williamson ran out of medication and I would contact the personnel at Mental Health Services of Southern Oklahoma to arrange for Dr. Snow to call in another prescription. The only name of the drugs prescribed for Mr. Williamson at that time that I can remember is Thorazine. Early on in my representation of Mr. Williamson I became concerned that he was being over medicated because he appeared to be too drowsy on occasions when I would attempt to interview him. As a result of this problem I requested that Mr. Williamson's dosage be reduced. Dr. Snow is an elderly lady, and is the only psychiatrist in Ada. I did not find her to be very communicative regarding Mr. Williamson's mental condition. I never had a formal interview with her regarding Williamson, nor did I subpoena her for the trial or any hearing. However, on one occasion she did tell me not to let the jailers lock me in the cell with Mr. Williamson....

(Pet., App. K, Affidavit No. 6).

Petitioner's conduct during the criminal proceedings should also have put counsel on notice of a potentially serious problem. Indeed, counsel attempted to withdraw from his representation of Petitioner due to Petitioner's unpredictable and often violent behavior, but the request was denied. Counsel stated,

> I want the record to show I am now making application to withdraw. That boy won't cooperate with me at all. If he was paying me, I wouldn't be here. I can't represent him, Judge; I just can't do it. I don't know who's going to, but I can't. And I'm—if I can't get relief here, I'm going to see if I can't get it from the Court of Criminal—I'm not going to put up with this. I'm too damn old for it. I don't want

anything to do with him, not under any circumstances. . . .

(PH Tr. 2). It also appears that Petitioner's conduct became so outrageous during the preliminary hearing that counsel inquired of the judge, "Do you want me to load him down with about a hundred milligrams of—" (PH Tr. 178).

■ In *Fisher v. State,* 736 P.2d 1003, 1013 (Okla.Crim.App.1987), *aff'd on reh'g,* 739 P.2d 523 (Okla.Crim.App.1987), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988), *reh'g denied,* 487 U.S. 1246, 109 S.Ct. 3, 101 L.Ed.2d 955 (1988), the court stated that appropriate action should be taken when defense counsel's pretrial preparation and investigation are so woefully inadequate as to undermine confidence in the outcome of the trial. Further, this duty extended throughout the course of the trial, and counsel had at his disposal a state statute to request that all criminal proceedings be suspended until the issue of Petitioner's competency was resolved. Therefore, this court finds that further investigation by Petitioner's counsel would have led to evidence which would have materially aided the defense and created a reasonable probability that the result of the trial would have been different. Counsel's decisions not to seek a professional opinion about Petitioner's competency before trial, initiate competency proceedings, or pursue an insanity defense cannot be considered matters of trial strategy. These considerations seriously undermine this court's confidence in the outcome of the trial. *See Osborn v. Shillinger,* 861 F.2d 612, 626 (10th Cir.1988).

Important legal issues raised by mental impairment may also have been exacerbated due to the ineffective assistance of counsel. Initially is the admissibility of admissions and confessions from Petitioner based upon the voluntariness of the statements. Courts have set aside convictions based upon confessions extracted from "persons who have been subjected to persistent and protracted questioning . . . or who have been unlawfully held incommunicado without advice of friends or counsel, or who have been taken at night to lonely and isolated places for questioning. Any one of these grounds would be sufficient cause for reversal." *Ward v. Texas,* 316 U.S. 547, 555, 62 S.Ct. 1139, 1143, 86 L.Ed. 1663 (1942) (footnote omitted); *See also Sims v. Georgia,* 389 U.S. 404, 407, 88 S.Ct. 523, 525, 19 L.Ed.2d 634 (1967); and *Lee v. State,* 700 P.2d 1017, 1020 (Okla.Crim.App.1985) (ability to voluntarily and intelligently waive *Miranda* rights).

In *Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), the Supreme Court held that evidence about the manner in which a confession was secured, besides bearing on its voluntariness, often bears on its credibility, a matter that is exclusively for the jury to assess. The Court found that the physical and psychological environments that yield a confession not only are relevant to the legal question of voluntariness but also can be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. This is especially true in a case such as this where there apparently was no physical evidence to link Petitioner to the crime. *Id.*

Here, Petitioner was arrested on a Friday night (Tr. 467–68). He was taken from his cell within twenty-four hours of his arrest to be interrogated by Agents Featherstone and Rogers of the OSBI (Tr. 467–69). Petitioner had been interviewed at least twice previously regarding this homicide and had steadfastly denied any involvement (Tr. 472–73). Agent Rogers testified that Petitioner verbally waived his *Miranda* rights and proceeded to relate that he had had a ***dream*** about killing the victim (Tr. 449). Agent Rogers also testified that the interview was terminated when Petitioner invoked his right to counsel (Tr. 450).

After this purported confession had already been presented to the jury, the trial court held a hearing to determine its voluntariness (Tr. 464–475). During the hearing, Agent Rogers testified that Petitioner appeared to understand his actions, and he was neither influenced by alcohol or drugs nor threatened or coerced (Tr. 466–67). On cross-examination, Agent Featherstone testified that "he [Petitioner] was not calm, cool, and collected, [yet he] could understand what he was saying" (Tr. 472). Counsel failed to explore this statement to discover the cause

of Petitioner's agitation. Agent Rogers admitted he did not videotape, audiotape, write or read the purported confession for Petitioner's review or signature, although equipment to properly record Petitioner's statement was readily available (Tr. 481–83).

Counsel filed no motions challenging the admissibility of the admissions or the confession based on voluntariness due to the manner in which they were secured or the apparent mental problems of Petitioner. *See United States v. Rivera,* 900 F.2d 1462, 1473 (10th Cir.1990) (failure to file motions to suppress may render counsel ineffective). Further, counsel presented no evidence at the hearing concerning the lack of a knowing and intelligent waiver by Petitioner of his *Miranda* rights, although Petitioner's admissions and confession were made during a period in 1987 when he had been in and out of mental institutions and on and off medication (Tr. 464–465). Petitioner's mental illness may have rendered it impossible for him to understand his constitutional rights, or in any way to waive them knowingly, intelligently, and voluntarily. *See Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (any use of an involuntary confession against a defendant in a criminal trial violates due process), and *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

The most important point not investigated by counsel was the fact that Petitioner was not on his medication when he waived his rights and gave the dream confession. This was confirmed in the October 21, 1987, letter from Ms. Norma Walker (Pet., App. K, Affidavit No. 10). When Petitioner was arrested on May 8, 1987, he had been off his medication for over a month and remained unmedicated until June 1987.[7] Thus, Petitioner was questioned by Agent Rogers and Featherstone during a time when he may have been suffering from delusional thought, impaired consciousness, and confused thinking. *Id.*

Ms. Walker's letter informed counsel that Petitioner could not care for himself when he was unmedicated, yet counsel failed to present any evidence of how much Petitioner slept and ate while he was in jail and while he was off his medication (Pet., App. K, Affidavit No. 10). Counsel continually ignored overwhelming evidence of Petitioner's mental problems. Without a comprehensive understanding of Petitioner's psychiatric history, and absent the benefit of a court appointed psychiatrist, counsel did not and could not have had adequate knowledge to forego challenging (1) the voluntariness of his client's confession based on his mental handicap and the manner in which it was extracted; (2) the admissibility of the admissions made during his stay in the Pontotoc County Jail after being charged with murder, but before trial; and (3) the waiver of his client's *Miranda* rights.

### Penalty Stage

■ The failure of counsel to present any mitigation evidence in the second stage of the proceedings also fell below the requirements set forth in *Strickland.* In Oklahoma, the jury is required to weigh the aggravating and mitigating factors to determine whether the death penalty should be imposed. Okla.Stat. tit. 21, § 701.11. In this case, the jury found that the following three aggravating factors applied to the murder: (1) there exists a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; (2) the murder was especially heinous, atrocious or cruel; and (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. However, there was no mitigating evidence presented, as counsel rested at the conclusion of the State's case.

As the Supreme Court has held, defense counsel must discharge significant constitutional responsibilities at the sentencing phase of a capital trial. *Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. In a capital

---

**7.** In March 1987, Petitioner was admitted twice to Central State Hospital in Norman. One of those admissions was voluntary and one involuntary. Petitioner was given Lithium and Navane while being treated at Central State. There is no record of Petitioner's being given any medication after he was discharged on March 23, 1987. (Petition, App. J, Index 1–14).

case "accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may have never made a sentencing decision." *Gregg v. Georgia,* 428 U.S. 153, 190, 96 S.Ct. 2909, 2933, 49 L.Ed.2d 859 (1976), *reh'g denied,* 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976). In *Gregg* and its companion cases, the Court emphasized the importance of focusing the jury's attention on "the particularized characteristics of the individual defendant." *Id.* at 206, 96 S.Ct. at 2941. *See also Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Roberts v. Louisiana,* 428 U.S. 325, 333, 96 S.Ct. 3001, 3006, 49 L.Ed.2d 974 (1976), *reh'g denied,* 429 U.S. 890, 97 S.Ct. 248, 50 L.Ed.2d 173 (1976), and *Woodson v. North Carolina,* 428 U.S. 280, 303–305, 96 S.Ct. 2978, 2990–2992, 49 L.Ed.2d 944 (1976).

To determine whether counsel's performance was below the prevailing standards, the court must review the record. Had trial counsel investigated and secured the necessary witnesses, he could have presented evidence of Petitioner's life history, his increasing inability to function and the considerable medical documentation. Therefore, this court concludes that counsel performed well below the prevailing norm in his handling of the penalty phase of this capital case.

Having reached this conclusion the court must next determine whether Petitioner has met his burden of proving that counsel's ineffective assistance prejudiced him. The Tenth Circuit Court of Appeals noted in *Osborn v. Shillinger,*

> The Court intended the prejudice standard to be flexible, it emphasized that "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Instead, the defendant bears the burden of showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome."

861 F.2d 612, 626 (10th Cir.1988) (quoting *Strickland,* 466 U.S. at 693, 694, 104 S.Ct. at 2067, 2068) (internal citations omitted).

When the ineffective assistance claim relates to the sentencing phase of the trial, the standard is whether there is "a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069. In deciding whether Petitioner was prejudiced, the court must keep in mind the strength or weakness of the State's case and the aggravating factors the jury found, as well as the mitigating factors that might have been presented if Petitioner had been provided effective assistance of counsel. *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069.

Given the weakness of the case against Petitioner, this court has little doubt that the available mitigating evidence would have changed the jury's decision to impose the death penalty. Considering the scarcity of evidence, this court concludes that had the jury been presented with mitigation evidence, including Petitioner's long history of psychiatric problems, a reasonable probability exists that the outcome of Petitioner's trial would have been different and the balance of aggravating and mitigating circumstances did not warrant death.

### B. *Deprivation of Due Process*

Respondents argue that the issue of whether Petitioner was denied due process by the State's failure to order a competency evaluation *sua sponte* is not subject to review due to a procedural bar. This issue was raised by appellate counsel as Proposition No. 32 in the Petition for Post Conviction Relief. However, the issue was deemed waived by the Oklahoma Court of Criminal Appeals in the Order Denying Post–Conviction Relief, Case No. PC–92–1010, dated May 3, 1993.

It is a well-established principle that federal courts will not review a state court's interpretation of federal law on direct review, "if the decision of [the state] court rests on a

state law ground that is independent of the federal question and adequate to support that judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 2553, 115 L.Ed.2d 640 (1991), *reh'g denied,* 501 U.S. 1277, 112 S.Ct. 27, 115 L.Ed.2d 1109 (1991). A state court's finding is considered independent "if it is separate and distinct from federal law." *Andrews v. Deland,* 943 F.2d 1162, 1188 n. 40 (10th Cir.1991), *cert. denied,* 502 U.S. 1110, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992), *reh'g denied,* 503 U.S. 967, 112 S.Ct. 1580, 118 L.Ed.2d 221 (1992) (citing *Ake v. Oklahoma,* 470 U.S. 68, 75, 105 S.Ct. 1087, 1092, 84 L.Ed.2d 53 (1985)).

In *Ake,* the Supreme Court held Oklahoma's waiver rule does not apply to fundamental trial error which necessarily included federal constitutional error. *Ake,* 470 U.S. at 74–75, 105 S.Ct. at 1091–1092. The Court stated:

> Thus, the State has made application of the procedural bar depend on an antecedent ruling of federal law, that is, on the determination of whether federal constitutional error has been committed. Before applying the waiver doctrine to a constitutional question, the state court must rule, either explicitly or implicitly, on the merits of the constitutional question.

*Id.* at 75, 105 S.Ct. at 1092. Because this state procedural ruling is dependent on an antecedent ruling of federal law, "the state-law prong of the court's holding is not independent of federal law." *Id.* Therefore, under the holding of *Ake,* this court concludes the Court of Criminal Appeals' decision did not rest on an "independent" state law ground and this claim is not procedurally barred. Accordingly, the court must address the merits of this claim.

 The conviction of an incompetent person is a denial of due process. *See Bishop v. United States,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956) (per curiam decision summarily vacating the judgment and remanding to district court for a competency hearing); *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966). Where a doubt exists as to a defendant's competency, the failure to conduct the proper inquiry is a deprivation of his constitutional right to due process. *See Pate,* 383 U.S. at 385, 86 S.Ct. at 842.

> Due process requires a trial court to conduct a competency hearing *sua sponte* whenever the "evidence raises a bona fide doubt as to the defendant's competence to stand trial." ... The Court has acknowledged that there are no "fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed" ... but has recommended that the factfinder consider "evidence of a defendant's irrational demeanor at trial, and any prior medical opinion on competence to stand trial" in reaching its decision. *The Court noted that even one of these factors standing alone may, in some circumstances, be sufficient.* Information tending to establish the requisite doubt "need not be presented in a formal motion nor argued by defense counsel nor presented to the judge in the form of admissible evidence."

*Coleman v. Saffle,* 912 F.2d 1217, 1224 (10th Cir.1990), *cert. denied,* 497 U.S. 1053, 111 S.Ct. 22, 111 L.Ed.2d 834 (1990) (citing *Drope v. Missouri,* 420 U.S. 162, 180–181, 96 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975)) (internal citations omitted and emphasis added).

The duty to investigate and in appropriate circumstances to request that criminal proceedings be suspended pursuant to Okla.Stat. tit. 22, § 1175.2A when the defendant's competency is in question, is placed upon not only defense counsel but also the district attorney. *See also* Okla.Stat. tit. 19, §§ 215.4–215.35A. "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." Okla.Stat. tit. 5, Ch. 1 App. 3–A, Rule 3.8 comment (1995). Further, "[t]he court, at any time, may initiate a competency determination on its own motion, without an application, if the court has a doubt as to the competency of the person." Okla.Stat. tit. 22, § 1175.2A.

 After a careful review of the record, this court concludes that there was sufficient

evidence before the trial judge and district attorney to mandate a hearing on Petitioner's competency to stand trial. It is apparent from the record that both the preliminary hearing and trial judges had prior knowledge of Petitioner's mental problems. Ironically, the special district judge who presided at Petitioner's preliminary hearing was the same judge who, less than three years earlier, declared Petitioner incompetent to stand trial in Case No. CRF 84–218 (Pet., App. J, Index 7) and then proceeded with the case without a subsequent finding to the contrary (Pet. 27). The district judge who presided at Petitioner's trial was approached as early as 1979 by Petitioner's sister Annette Hudson seeking professional help for her brother (Pet., App. K, Affidavit No. 4). Although these two different judges presided at the preliminary hearing and trial, the statutory duty to suspend proceedings under appropriate circumstances was upon them both. A preliminary hearing is included in the definition of "criminal proceeding" under the statute. Okla.Stat. tit. 22, § 1175.1(3).

Further, Petitioner's disruptive behavior, during both his preliminary hearing and trial proceedings, unquestionably raised serious doubts as to Petitioner's competency. Petitioner turned counsel table over on counsel's secretary during the preliminary hearing and was required to leave (P.H. Tr. 2–7). Despite numerous requests by the judge, Petitioner never returned. As noted earlier in this Order, one of Petitioner's treating therapists observed that most persons in Petitioner's position would have insisted upon being present at a proceeding as important as the preliminary hearing in a murder case (Pet., App. K, Affidavit; Psychological Report No. 9). Defense counsel also related to the trial court judge that Petitioner's abnormal behavior and heavy medication with Thorazine interfered with his client's ability to assist him in the preparation of the defense. In fact, many times throughout the trial defense counsel and the trial judge held bench conferences discussing Petitioner's inability to function properly and the possible effects of his disruptive behavior upon the jury.

Having found that Petitioner's constitutional rights were abridged by the failure to receive a hearing on his competence to stand trial at the request of defense counsel, the district attorney or the trial judge, this court directs that a conditional writ of habeas corpus must issue. If the State elects to retry Petitioner, he will, of course, be entitled to raise the question of his competence to stand trial at that time and to request a special hearing on that issue. In *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), the Supreme Court discussed whether the state could discharge its constitutional obligation by conducting a limited hearing to determine the defendant's mental competence at the time he was tried. The Court found that a limited hearing would not be sufficient due to the difficulty of "retrospectively determining an accused's competence to stand trial." *Pate,* 383 U.S. at 387, 86 S.Ct. at 843 (citing *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). The Court also noted that "the jury would not be able to observe the subject of their inquiry, and expert witnesses would have to testify solely from information contained in the printed record. That Robinson's hearing would be held six years after the fact aggravates these difficulties." *Id.* In Petitioner's case the fact that seven years have elapsed since he was tried emphasizes the futility of conducting a limited hearing to determine in 1995, his competence to stand trial in 1988. If found competent to stand trial, Petitioner will have the usual defenses available to an accused.

This court shall now address additional constitutional errors which are further grounds for granting the writ of habeas corpus and which may affect Petitioner in the event of retrial.

## II. CLAIMS OF INEFFECTIVE COUNSEL UNRELATED TO COMPETENCY

In addition to claims of ineffective counsel related to competency, Petitioner contends counsel was ineffective for failing to adequately investigate two witnesses and for failing to utilize certain evidence concerning these witnesses. Further, Petitioner argues counsel was ineffective, because he failed to introduce a confession by Ricky Simmons,

given after Petitioner was charged with the crime.

### A. Glen Gore

 Petitioner argues counsel did not thoroughly investigate and present evidence concerning Glen Gore as a suspect in the case. Glen Gore was admittedly the last person to see Debra Sue Carter alive (Tr. 320). Gore said he and a friend went to another club after leaving Ms. Carter at the Coach Light Club (Tr. 316), but Tommy Glover testified for the prosecution that he saw Gore talking to Ms. Carter as she was getting into her car to leave the club (Tr. 340).[8] Gore agreed to submit to a polygraph examination, but one was never administered (Tr. 321–22). He said he gave hair samples at least twice, perhaps three times (Tr. 322). But, when these samples were finally examined in 1988, the OSBI failed to compare them to the 32 unidentified hairs found in the victim's apartment. Rather, the State's expert inexplicably compared the Gore hairs to the slides he was preparing to testify about in court, i.e., the hairs he had already identified as microscopically consistent with Debra Carter, Petitioner, or Dennis Fritz. Finally, although fingerprints from 23 suspects and 21 other individuals who had been in the victim's apartment were sent to the OSBI for comparison with the prints found in the apartment, Gore's fingerprints were never submitted (O.R. 63–67).

At the time Gore stated he would not testify at Petitioner's trial, he was serving a forty-year sentence on convictions for, among other things, burglary, kidnapping, shooting with intent to injure, and feloniously pointing a weapon—all involving an attack on a young woman and her daughter (PH Tr. 33; Tr. 327–28; Pet. 43).

According to Petitioner's report of the criminal file in the State's case against Gore, a plea bargain agreement was entered just one week after Gore was listed as an additional witness in Petitioner's case. Appar-

ently, a second kidnapping charge and a charge of assault and battery with a dangerous weapon were then dropped. The court file in that case contained a letter from the victim's parents in which they implored the judge to set a long sentence for Gore, stating:

> We want you to be aware of how dangerous we feel this man is. He intends to kill our daughter, granddaughter, and ourselves. This he has told us.

> We have gone to great lengths to make our daughter's home burglar proof, but all failed. To go into detail of all the times he has attacked her would make too lengthy a letter.

> Please give our daughter enough time to get the child raised before he is out of prison and the terror starts, again, so the little one never has to live through that again.

Petitioner's uncontested assertion is that this document was filed June 3, 1987, so it was available for impeachment purposes at the time Gore testified at the preliminary hearing (Pet. 44). Counsel did not develop any testimony regarding Gore's prior convictions (PH Tr. 32–45). Impeachment during the preliminary hearing was critical due to Gore's refusal to testify at Petitioner's trial and the judge's decision to allow his previous testimony from the preliminary hearing to be read to the jury. As a result the jury never knew that Gore's offenses involved an assault on a woman and her child, that he had previously attacked and threatened this same woman on several occasions, and that he had entered into a plea bargain with the district attorney just one week after being listed as an additional witness in this case. Also, if counsel had interviewed Tommy Glover, he might have learned that Glover originally related to co-workers that the "conversation" he saw Gore having with Debra Carter in the Coach Light parking lot was actually an argument and that Gore had shoved Ms. Carter at the end of their encounter (Pet., App. F).

---

8. Although Glover's testimony at trial made this discussion in the parking lot seem innocuous, persons who worked with Glover have stated that as Glover related the incident *at the time*—in December 1982—Gore and Ms. Carter were ar-

guing and Gore shoved her into the car. This information was not relayed to Petitioner's trial counsel until after the jury had reached its verdict in the guilt stage of the trial (Pet., App. F).

With respect to the forensic evidence in Petitioner's case, it appears that counsel accepted the testimony of the State's hair expert Melvin Hett that Hett had compared Gore's hair samples to the unidentified hairs found in the victim's apartment. Although the State contributed to this failure by not turning over Hett's report until he was actually testifying, counsel ultimately missed the fact that the report could not eliminate Gore as a suspect. As a result, the prosecutor was able to argue in closing that Gore had been "eliminated" when, in fact, he had not. Other failures to conduct forensic tests on samples supposedly submitted by Gore, i.e., the secretor/non-secretor test and the identification of fingerprints found in the victim's apartment, went unnoticed by counsel although they appeared in the OSBI technical reports provided to him before trial (O.R. 62–63, 65–67, 76).

The Oklahoma Court of Criminal Appeals has held that it is an attorney's duty to "conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Jennings v. State*, 744 P.2d 212, 214 (Okla.Crim.App.1987) (citing *The American Bar Association Standards for Criminal Justice, Defense Function* 4–4.1). In this case, as in *Jennings*, the "blatant lack of investigation indicates a severe deficiency in the performance of trial counsel." *Jennings*, 744 P.2d at 214.

It is apparent from the record that counsel's attempt to paint Gore as a possible suspect in this case was severely hampered by a lack of investigation. "When counsel knows of the existence of a person or persons who possess information relevant to his client's defense, and he fails to use due diligence to investigate that evidence, such a lack of industry cannot be justified as strategic error." *Jennings v. State*, 744 P.2d 212, 214 (Okla.Crim.App.1987). Counsel's decision not to investigate and pursue this evidence cannot be justified as a strategic decision.

> The decision to interview a potential witness is not a decision related to trial strategy. Rather, it is a decision related to

adequate preparation for trial. Reasonable performance of counsel includes an adequate investigation of the facts of the case, consideration of viable theories ... There is no reasonable professional judgment that would support trial counsel's failure to investigate this witness.

*Henderson v. Sargent*, 926 F.2d 706, 711 (8th Cir.1991), *modified on reh'g*, 939 F.2d 586 (8th Cir.1991), *cert. denied*, 502 U.S. 1050, 112 S.Ct. 915, 116 L.Ed.2d 815 (1992) (internal citations omitted).

Having found counsel's performance deficient, the court turns to the prejudice prong of the *Strickland* analysis. As in *Henderson*, had the jury been aware of all the facts surrounding the murder, it may have been presented with significant doubts about Petitioner's guilt. Without evidence of Gore's relationship to the victim and his criminal record, the jury that convicted Petitioner had no reason to question inferences the State drew from its circumstantial case. This is not a case in which the evidence against the defendant is so overwhelming that ineffectiveness of counsel might be deemed harmless. "There is a substantial possibility that correction of constitutional error at retrial will effect a different result." *Henderson*, 926 F.2d at 713.

### B. Terri Holland's Motivation to Testify

■ Another troubling aspect of this case concerns the motivation of one of the State's most important witnesses, Terri Holland. Holland's testimony provided the only evidence of straightforward admissions of guilt by Petitioner.

Holland's maiden name was McCartney, and she went by both names at various times in the proceedings. According to her testimony, she had three felony convictions, one being a federal conviction for conspiracy to defraud the federal government, another for forgery, and the last for passing bogus checks. This most recent conviction was in Pontotoc County Case No. CRF–84–172, and Holland's incarceration in the Pontotoc County Jail from October 1, 1984, until January 23, 1985, was from the prosecution of that

case (Pet., App. N, Fontenot Tr. 1824–25; Williamson Tr. 580, 789–90).

Holland claims that during that incarceration she heard not only Petitioner's confession for the murder of Ms. Carter (Tr. 574–77, 579–80), but also Karl Allen Fontenot's confession for the murder of Donna Haraway (Pet., App. N, Fontenot Tr. 1826–28). Holland testified that she did not inform the district attorney's office of Petitioner's alleged confession until February 1986, because she assumed that other personnel in the jail were already aware of his statements (Tr. 591). However, no such reporting delay occurred in Mr. Fontenot's case, since she testified against him as early as his preliminary hearing in January 1985 (Pet., App. N, Fontenot PH Tr. 878–79, 888, 890–91).

On December 4, 1984, Holland entered a guilty plea to her bogus check charge and, despite the fact that she had two prior felony convictions, received only a five-year sentence with three of the five years suspended. In addition to restitution for the checks, she was also obligated to pay a total of $345.00 in costs and fees to the court clerk's office at a rate of $50.00 per month. By the time of Petitioner's trial in April 1988, Holland had made only one $50.00 payment (Tr. 789–91). Petitioner represents to this court that as of September 21, 1994, the docket sheet in that case shows this was the only payment Holland ever made (Pet. 49).

After serving eleven months of her two-year prison sentence, Holland was released to the house arrest program (Pet., App. N, Fontenot Tr. 1826). However, she was soon having problems with the law again. According to her trial testimony in Petitioner's case, she was called before the district attorney's office in Seminole in 1986 over some bad checks she had previously passed there. Seminole is in the same district attorney's district as Pontotoc County. No conviction was obtained against her over these checks, although she apparently agreed to pay $800.00 in restitution, and by the time of Petitioner's trial the district attorney's office was insisting she make another $800.00 payment (Tr. 587–89).

It is not clear from the record whether this arrangement was made before or after February 1986. However, it was in February 1986 that Holland says she finally decided to tell the district attorney's office that back in the winter of 1984–85 she had heard not only Carl Fontenot's murder confession, but also Petitioner's murder confession (Tr. 591). Holland denied she ever received any compensation or promises of leniency from the State in return for her testimony in either the Fontenot prosecution or in Petitioner's case (Pet., App. N., Fontenot Tr. 1825; Williamson Tr. 580).

Counsel's failure to effectively bring out at trial Terri Holland's testimony in the Fontenot case cannot be explained. Holland's participation in the Fontenot case was a matter of public record and could have easily been discovered with minimal investigation into her background. Moreover, counsel's failure to bring out this evidence on cross-examination rendered counsel's performance ineffective. *See United States v. Cronic*, 839 F.2d 1401, 1403 (10th Cir.1988). This court finds counsel was ineffective for failing to bring Terri Holland's background to the attention of the jury, and such failure was prejudicial to the Petitioner.

### C. Confession of Ricky Simmons

■ On September 23, 1987, while Petitioner was being held in jail, Ricky Jo Simmons voluntarily came into the Ada police station to confess to the murder of Debra Carter. In contrast to the procedure employed by the Ada Police Department when taking Petitioner's alleged confession, Simmons came back the following day for a videotaped account of the confession he had previously given. Having been exposed to the publicity in the media, Simmons felt the need to turn himself in and confess to this crime he was convinced he had committed. Although the investigator conducting the videotaped interview repeatedly tried to convince Simmons he had not killed Ms. Carter, but was instead mentally ill, Simmons responded, "I think I killed her." (Pet., App. I, Simmons videotape). At one point during the video the investigator actually assumed an almost parental role and asked Simmons whether he would keep an appointment for

psychiatric counseling if the investigator arranged one. Simmons said he would.

In Simmons' confession he states he knew Carter and had lived across the street from her for years while growing up in Ada. He had also worked with the victim's mother at "Brockway." Therefore, his past connections with Ms. Carter are consistent with his claims that she willingly gave him a ride to her apartment and allowed him to come in. These connections also corroborate his admission that he strangled her because she recognized him. Although he had more than one version of events, several of his stories involved rape and strangulation. By contrast, in no single statement does Petitioner admit to both acts which are the central facts of this case. Both Petitioner and Simmons admitted in their videotaped statements that they had heard some of the details of the crime scene from other persons. However, only Simmons discusses the wall writings, describes "bloody stuff" being smeared on the body, and freely discusses the participation of another person.

Further, Simmons admits to having "taken every kind of drug you can think of" including "crank and battery acid" and stated he had been previously treated in the abuse center at St. Anthony's Hospital. Simmons also admitted he was on acid the night of the murder.

Counsel had access to this videotape long before trial, yet he did not attempt to introduce the tape or reveal the existence of the Simmons confession during the trial (*See* 12/2/87 M. Tr. 9; 12/14/87 M. Tr. 25; Tr. 485). Only slight references were made to the Simmons confession during the trial, and, in fact, the jury was never informed that Simmons had actually told police he raped and killed Ms. Carter (Tr. 485, 881). Counsel's admission in his affidavit that he could not remember why he did not bring this evidence to the attention of the jury strongly indicates that this omission was not the re-

sult of a rational trial strategy (App. K, Affidavit No. 6). Counsel states, "Upon reflection, I think that I should had [sic] attempted to do so because Simmons' confession was as believable as Mr. Williamson's." *Id.*

Had counsel used the evidence available to him, the jury would have gone into deliberations with the knowledge that two men, both with apparent mental problems, had given factually inaccurate confessions to the same crime. The jury would then have had to weigh both confessions and might well have decided that there was reasonable doubt as to Petitioner's guilt. Since the Simmons confession was not brought to the jury's attention, Petitioner could not have had a complete defense. Accordingly, this court finds that Petitioner was deprived of effective assistance of counsel and was prejudiced thereby.[9]

### III. HAIR EVIDENCE

Petitioner alleges in Ground V that the unreliability and inherent subjectivity of microscopic hair comparison should prohibit its admissibility. Petitioner further alleges that the trial court erred when it refused to appoint a hair expert to refute evidence put forth by the State's hair expert Melvin Hett (Pet. 95).

The prosecution's only physical evidence, apart from the semen evidence, were hairs allegedly found to be "microscopically consistent" with Petitioner and his co-defendant Dennis Fritz (Tr. 731–34). Dennis Smith, retired detective captain of the Ada Police Department, testified that he and OSBI Agent Gary Rogers collected several hundred hairs at the crime scene. Individual hairs were placed in paper bindles which are pieces of paper that have been folded over several times (Tr. 384). The victim's stuffed animals which had hairs attached to them were placed in bags (Tr. 428–30). Head hair,

---

9. Although defense counsel was legally ineffective in Petitioner's trial, this court is well aware of his many years of credible service to the public in both criminal and civil matters. Petitioner's case points out the critical need for public defenders who are specialists in criminal death penalty defense. Quality representation of indi-

gent defendants requires adequate funding which allows reasonable limits on attorneys' caseloads and effective support resources. The system in which private attorneys are appointed to these cases is afflicted with many pitfalls, including inexperience, unmanageable caseloads and meager compensation for services.

pubic hair and saliva samples were taken from the victim's family and friends shortly after the murder. Samples were also collected from Glen Gore, who likely was the last person seen with the victim, and Mike Carpenter, whose fingerprint was found in her car. Smith and Rogers transported these samples to the Oklahoma State Crime Bureau (Tr. 391–92).

In March 1983 the police department asked Petitioner and Dennis Fritz to submit hair and saliva samples, and they complied. These samples were also taken to the OSBI for analysis (Tr. 396–98). Rogers testified that about three days later, Petitioner complied with a request for additional pubic hair samples, because not enough had been obtained earlier (Tr. 458). About a year and one half after the murder, Smith could not remember whether Gore's samples had been submitted, so additional samples were taken and sent to the crime bureau (Tr. 391–92).

Mary Long, OSBI criminalist, testified that she collected pubic combings from the victim and hairs from articles found in the victim's apartment. She also collected known pubic hair and known scalp hair from the victim.[10] Long sent this evidence to Susan Land, another OSBI criminalist (Tr. 664–74). In all, Long submitted 45 hair sample containers to Land (Tr. 690–92).

Susan Land testified that although she had hair samples from many individuals, the only samples she mounted on microscope slides were those from the victim, Petitioner and Fritz (Tr. 699–702). She stated that she may have commenced a microscopic examination of some of the hair samples, but stopped because she did not feel she could be objective in her analysis due to the "stress and strain" from working on numerous homicide cases. Consequently, she turned the mounted and unmounted hair samples over to Melvin Hett on September 19, 1983 (Tr. 699–706).

Hett, the third OSBI criminalist to examine the evidence, testified that he had been engaged in the science of hair identification approximately 13 years and that about 90% of his time was devoted to hair and fiber comparisons and analysis (Tr. 712). He brought charts (State's Exhibits 30–33) prepared at his request to demonstrate the major racial characteristics of hair: Caucasian, Negroid and Mongoloid. He stated that in Oklahoma, however, there are many mixtures of the three racial types. He explained that a cross section of a human hair shows the three areas of human hairs: the cuticle or outer layer of scales, the cortex which gives hair its color, and the medulla which is usually just an air sack running down the center of the hair. Hett further testified that there are approximately 25 characteristics used in hair comparisons. He used his exhibits to demonstrate other characteristics and variations used in hair analysis and discussed factors such as bleaching, dying, sun bleaching and brushing which can change the characteristics of an individual hair (Tr. 712–21). He explained that the root of an individual hair can have different characteristics from its far tip, and the hairs on an individual's head do not all look exactly the same. Therefore, when a known hair sample is to be used for comparison, the OSBI usually requests at least 30 hairs to account for variations of an individual's hair (Tr. 724–728).

Hett testified he uses a stereo microscope which magnifies approximately 30 times for low power hair comparisons and a comparison microscope which allows the viewer to look at and compare 2 different hair samples simultaneously at a magnification of 50 to 400 times. He stated he spent several hundred hours in his examination of the hair samples in this investigation (Tr. 728–29).

Hett said he received hair samples from Susan Land on September 19, 1983, some of which were mounted on slides and some of which were in bindles. He also received additional samples directly from the Ada Police Department (Tr. 728). Mary Long also sent him scalp and pubic hair samples from Ricky Simmons in October 1987 (Tr. 752).

When asked by the prosecutor whether he found any pubic hairs from the washcloth from the victim's mouth that "matched"

---

**10.** Hairs collected directly from an individual are called his "known" hairs. Unidentified hairs collected at the scene are called "questioned" hairs.

Fritz's pubic hairs, Hett testified he found 1 that was "consistent microscopically" with Fritz's pubic hairs and "could have the same source." Defense counsel objected to Hett's answer or the form of the question, and the objection was sustained. Hett then testified that he found 2 pubic hairs "consistent" with Fritz's pubic hairs on the panties found at the scene and 1 pubic hair on the floor under the victim's body that was also "consistent" with Fritz's. He found 7 pubic hairs removed from bedding and mounted on slides by Susan Land which were "consistent" with Fritz's pubic hair. In all, there were 11 hairs that he found "consistent" with Fritz's pubic hair. He also found 1 scalp hair from the bedding and 1 scalp hair from the floor that were "consistent microscopically" with Fritz's scalp hair and could have the same source (Tr. 731–34).

With regard to Petitioner's hair, Hett testified he found 2 pubic hairs from the bedding that were "consistent microscopically and *could have* the same source as Ron Williamson's known pubic hair." He also found 2 scalp hairs on the washcloth which were "consistent microscopically and *could have* the same source" as Petitioner's known scalp hair (Tr. 733) (emphasis added).

The prosecutor questioned Hett about what "could have the same source" meant. Hett explained, "When a hair *matches,* if you will, it is consistent microscopically to a known source." (Tr. 734) (emphasis added). After an objection by defense counsel, Hett went on to say he meant that

> [T]he hairs either did originate from that [known] source, or there could be or might be another individual in the world somewhere that might have the same microscopic characteristics. In other words, hairs are not an absolute identification, but they either came from this individual or there is—could be another individual somewhere in the world that would have the same characteristics to their hair.

(Tr. 734–35).

Hett testified he received scalp and pubic hairs from a number of individuals, including

Glen Gore. These persons were eliminated as possible sources of the questioned hairs after Hett's "direct comparisons" indicated the known samples were not "microscopically consistent" with the questioned hairs (Tr. 735–37).

Under cross-examination, Hett stated he completed three reports for this investigation, but only the first two were submitted by the prosecution as a trial exhibit. The first two reports were dated December 1985 and January 9, 1986. The third report, covering evidence received by OSBI from 1985 through 1987, was dated April 7, 1988, the day after Fritz's trial began. Defense counsel was unaware of the third report until this cross-examination and did not receive a copy until then (Tr. 738–41).

Under cross-examination, Hett testified that he could not determine with certainty that a particular hair came from a certain person, but he could only state whether a questioned hair "might" have come from a certain individual (Tr. 767). He admitted that hair comparisons are not absolute identifications like fingerprints. *Id.*

### A. Admissibility of Hair Evidence

▇▇▇▇ Petitioner argues that the State's hair evidence presented by its expert was inadmissible due to its unreliability and inherently subjective nature. The State asserts that the reliability of hair evidence is a jury question, rather than an admissibility issue.

Of the hundreds of hairs submitted to OSBI for analysis, 2 scalp hairs and 2 pubic hairs were found to be "consistent microscopically" with Petitioner's known scalp and pubic hairs. However, the State's expert did not explain which of the "approximately" 25 characteristics were consistent, any standards for determining whether the samples were consistent, how many persons could be expected to share this same combination of characteristics, or how he arrived at his conclusions.[11] Hett did acknowledge that "con-

---

11. There is an apparent lack of consensus among hair examiners about the number of characteristics, and it has been suggested that there is a need for more accurate definitions of hair features in microscopic hair examination. *See* Aitken & Robertson, *The Value of Microscopic Fea-*

sistent microscopically" is not the same as a positive identification.

Forensic examination of human hair was conducted as early as 1861.[12] Hair comparison in a criminal prosecution was first considered over one hundred years ago by the Wisconsin Supreme Court. *Knoll v. State,* 55 Wis. 249, 12 N.W. 369 (1882). The hair expert in *Knoll* visually compared hair samples and concluded that they came from a common source. On appeal the court held that "such evidence is of a most dangerous character," and reversed the conviction. *Knoll,* 55 Wis. at 254, 12 N.W. at 371–72.

At the time of the *Knoll* decision, hair analysis was a new area of forensics. Since then, it has become a familiar and common component of criminal prosecutions with contemporary hair analysis relying heavily upon conventional microscopes. Modern hair experts generally state their results in testimony that samples are "similar" and "could have" come from the "same source." Critics of hair evidence have criticized the admission of hair evidence on the grounds that it is too subjective and it has a high error rate.[13]

In 1993, the United States Supreme Court held that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals,* —— U.S. ——, ——, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993).[14] *See also Taylor v. State,* 889 P.2d 319, 328–29 (Okla.Crim.App. 1995) (expressly adopting the *Daubert* holding). Reliability refers to trustworthiness of the evidence. "In a case involving scientific evidence, evidentiary reliability will be based upon scientific validity." *Daubert,* —— U.S. at —— n. 9, 113 S.Ct. at 2795 n. 9. This standard applies both to " 'novel' scientific techniques" and "well-established proposi-

tions." *Daubert,* —— U.S. at —— n. 11, 113 S.Ct. at 2796 n. 11.

Acknowledging that it would not be reasonable to require scientific testimony to be " 'known' to a certainty," the Supreme Court held that

[I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Daubert,* —— U.S. at ——, 113 S.Ct. at 2795.

■ In deciding whether proffered expert testimony is admissible, the trial judge must initially determine "whether the reasoning or methodology underlying the testimony is scientifically valid" and "whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* —— U.S. at ——, 113 S.Ct. at 2796. The Supreme Court recognized that many factors must be evaluated, and there is no set formula to follow, but the Court did give some "general observations" which it deemed appropriate. *Id.*

Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (*and has been*) tested. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." "[T]he state-

tures in the Examination of Human Head Hairs: Statistical Analysis of Questionnaire Returns, 31 J. Forensic Sci. 546 (1986); Robertson & Aitken, The Value of Microscopic Features in the Examination of Human Head Hairs: Analysis of Comments in Questionnaire Returns, 31 J. Forensic Sci. 563 (1986).

12. Moellenberg, *Splitting Hairs in Criminal Trials: Admissibility of Hair Comparison Probability Estimates,* 1984 Ariz.St.L.J. 521, 522 n. 10.

13. Imwinkelried, *Forensic Hair Analysis: The Case Against the Underemployment of Scientific Evidence,* 39 Wash. & Lee L.Rev. 41, 41–44 (1982).

14. *Daubert* held that Rule 702 of The Federal Rules of Evidence provides the standard for admitting expert testimony in a federal trial. The standard for admission of expert testimony in Oklahoma state courts is the same as Rule 702. Okla.Stat. tit. 12, § 2702.

ments constituting a scientific explanation must be capable of empirical test." "[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability."

*Daubert,* —— U.S. at —— – ——, 113 S.Ct. at 2796–97 (internal citations omitted and emphasis added).

An important consideration is "whether the theory or technique has been subjected to peer review and publication," a means of increasing the likelihood of detecting methodological flaws. In addition, when a particular scientific method is employed, "the court should ordinarily consider the known or potential rate of error." The "general acceptance" within the relevant scientific community may also be considered. Finally, if the probative value of relevant evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," the expert testimony can be excluded. *Daubert,* —— U.S. at —— – ——, 113 S.Ct. at 2797–98. *See also United States v. Smith,* 869 F.2d 348, 353–54 (7th Cir.1989), *United States v. Downing,* 753 F.2d 1224, 1238 (3d Cir.1985).

▇▇ This court agrees with the Oklahoma Court of Criminal Appeals' finding that the decision whether expert testimony is admissible requires an "independent, thorough review." *Taylor,* 889 P.2d at 332. However, in analyzing Petitioner's case under the guidelines of *Daubert,* this court has found an apparent scarcity of scientific studies regarding the reliability of hair comparison testing. The few available studies reviewed by this court tend to point to the method's unreliability. Although probability standards for fingerprint and serology evidence have been established and recognized by the courts, no such standards exist for human hair identification. Since the evaluation of hair evidence remains subjective, the weight the examiner gives to the presence or absence of a particular characteristic depends upon the examiner's subjective opinion. Consequently, any conclusion regarding whether a particular hair sample came from a certain individual depends upon the value judgment and expertise of the examiner.[15]

In response to studies indicating a high percentage of error in forensic analysis, The Law Enforcement Assistance Administration sponsored its own Laboratory Proficiency Testing Program. Between 235 and 240 crime laboratories throughout the United States participated in the program which compared police laboratories' reports with analytical laboratories' findings on different types of evidence, including hair. Overall, the police laboratories' performance was weakest in the area of hair analysis. The error rates on hair analysis were as high as 67% on individual samples, and the majority of the police laboratories were incorrect on 4 out of 5 hair samples analyzed. Such an accuracy level was below chance.[16]

Two studies by B.D. Gaudette of the Royal Canadian Mounted Police attempted to establish the probability of error when a questioned hair sample is found to be microscopically similar to known hair samples. Gaudette placed the probability that a single head hair which is microscopically similar to samples from a known source actually came from another source at about 1 in 4,500.[17] The estimated probability for this type of error in pubic hair analysis was 1 in 800.[18] Courts have disagreed on whether these probability estimates are admissible, and other researchers have severely criticized the studies, concluding that they are invalid.[19] Assertions have even been made that the Canadian probability estimates are virtually meaningless and grossly in error due to experimental bias resulting in an inaccurately

---

**15.** Miller, *Procedural Bias in Forensic Science Examinations of Human Hair,* 11 Law & Human Behavior 157, 157–58 (1987).

**16.** Imwinkelried, 39 Wash. & Lee L.Rev. at 44.

**17.** Gaudette & Keeping, *An Attempt at Determining Probabilities in Human Scalp Hair Comparison,* 19 J. Forensic Sci. 514 (1974).

**18.** Gaudette, *Probabilities and Human Pubic Hair Comparisons,* 21 J. Forensic Sci. 514 (1976).

**19.** Moellenberg, 1984 Ariz.St.L.J. at 521–22.

low probability estimate.[20] Gaudette has conceded that hair comparison is "still somewhat subjective," and that "hair is not generally a basis for positive personal identification."[21] He contends his critics misunderstood his research, but he did revise his probability figures to 1 in 57 for scalp hair and 1 in 17 for pubic hair for the relevant population of individuals.[22]

In one revealing study students enrolled in advanced college crime laboratory courses were trained to examine hair samples. All the students received training that met the level required for qualification to testify as human hair experts. This study found a 30.4% error rate in conventional hair comparisons when a questioned hair from a fictitious crime scene was compared with known hair samples from a fictitious suspect. The examiners' error rate fell to 3.8%, however, when the method of comparison was changed to the "lineup" method. In this second method, examiners were presented with hair from a fictitious crime scene and samples from 5 fictitious suspects which were similar to the questioned hair in comparison characteristics.[23]

The researcher in this study concluded that the conventional method is subject to unintentional bias among hair examiners. As with eyewitness identification, it appears that the accuracy rate for hair identification increases when multiple suspects are presented. Also, as with eyewitness identifications, erroneous conclusions can increase when the examiner is told which hair sample is from the suspect in the crime. A preconceived conclusion that questioned hairs and known hairs are from the same individual may affect the examiner's evaluation.[24] This court notes that hair expert Melvin Hett testified in the preliminary hearing that this conventional method of comparison was precisely the procedure used in Petitioner's case (PH Tr. 409–11).

Other forms of expert examination and testimony have been criticized because jurors may be awed by an "aura of special reliability and trustworthiness" which may cause undue prejudice, confuse the issues or mislead the jury. *United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir.1973). *See also United States v. Brady,* 595 F.2d 359, 362 (6th Cir. 1979), *cert. denied,* 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979). In the case of hair expert testimony the jurors do not have the opportunity for direct evaluation. Instead, they hear an abbreviated summary of the characteristics of hair and testimony of the expert's overall conclusions. *Cf. United States v. Williams,* 583 F.2d 1194, 1199–1200 (2d Cir.1978), *cert. denied,* 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979).

The clear implication from the expert's testimony in Petitioner's trial was that 4 of the hairs found at the victim's apartment belonged to Petitioner. As witness to the incorrect conclusion that could result from this testimony, the prosecutor said in his closing argument, "[T]here's a match." (Tr. 910). Even the Court of Criminal Appeals misinterpreted and overstated the hair evidence by writing, "Hair evidence *placed [Petitioner] at the decedent's apartment." Williamson,* 812 P.2d at 397 (emphasis added).

This court finds that the prosecutor's mischaracterization of the hair evidence misled the jury, the trial court and the appellate court to believe "microscopically consistent" equates with reliability and to conclude there was a "match" between questioned hairs and Petitioner's hairs. Actually, the most to be drawn from Hett's testimony was that the questioned hair samples could have come from Petitioner. This also means, of course, that the hair samples might not have been his. While it may be possible to exclude an individual as the source of a hair sample, it is not possible to prove questioned hairs are from a particular person.

20. Barnett and Ogle, *Probabilities and Human Hair Comparisons,* 27 J. Forensic Sci. 272, 273–74 (1982).

21. Gaudette, *Some Further Thoughts on Probabilities and Human Hair Comparisons,* 23 J. Forensic Sci. 758, 759–61 (1978).

22. Gaudette, *A Supplementary Discussion of Probabilities and Human Hair Comparisons,* 27 J. Forensic Sci. 279, 283 (1982).

23. Miller, 11 Law & Human Behavior at 160–61.

24. *Id.* at 161–62.

This court has been unsuccessful in its attempts to locate *any* indication that expert hair comparison testimony meets *any* of the requirements of *Daubert*. Not even the "general acceptance" standard is met, since any general acceptance seems to be among hair experts who are generally technicians testifying for the prosecution, not scientists who can objectively evaluate such evidence.[25]

This court has previously addressed the issue of hair expert testimony in the context of a criminal proceeding where the death penalty was sought. Such testimony by a special agent with the Federal Bureau of Investigation in Washington, D.C. was held inadmissible. *United States v. Hutching*, No. CR–92–32–S (E.D.Okla.) (Tr. of Testimony of D.W. Deedrick, Feb. 25, 1993, 34–69). Based in part on the hair expert's own testimony that there is no research to indicate with any certainty the probabilities that two hair samples are from the same individual, this court held that hair expert testimony was too speculative to be admissible. Admission of such testimony would have been "extremely unfair" and could "prejudice the defendants without any real probative value." (Tr. of Deedrick at 67, *Hutching*). This court is not persuaded to change those conclusions.

This court, therefore, finds that the introduction into evidence of expert hair testimony at Petitioner's trial was irrelevant, imprecise and speculative, and its probative value was outweighed by its prejudicial effect. The state of the art of hair analysis has not reached a level of certainty to permit such testimony. Although the hair expert may have followed procedures accepted in the community of hair experts, the human hair comparison results in this case were, nonetheless, scientifically unreliable. This court recognizes the long history of admissibility of such evidence, but as the *Daubert* Court stated, "[H]ypotheses ... that are incorrect will eventually be shown to be so." *Daubert*, — U.S. at —, 113 S.Ct. at 2798. Based on the reasons above, this court holds that hair comparison evidence based on forensic procedures employed in Petitioner's case is inadmissible.

### B. Denial of Forensic Expert

■ Petitioner alleges the trial court's denial of his request for a forensic expert foreclosed his opportunity for meaningful participation in his trial in violation of *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). The State, adopting the reasoning of the Court of Criminal Appeals in Petitioner's appeal, argues that Petitioner was not entitled to an appointed expert, because he failed to make the requisite showing to support his request. Further, the State alleges cross-examination of the State's expert sufficed for a defense hair expert. The State does not assert, however, that Petitioner was not entitled to the appointment of an expert witness other than a psychiatrist, as the appellate court held. *Williamson*, 812 P.2d at 395–96.

On August 4, 1987, co-defendant Fritz filed a motion requesting the assistance of a forensic expert knowledgeable in hair and an expert knowledgeable in saliva and semen samples for blood typing (O.R. at 110). The motion was argued on September 8, 1987 (Pet. 96). Later that same day, Petitioner adopted both the motion and Fritz's oral argument requesting expert assistance in a motion hearing (09/08/87 M. Tr. 3). The court denied both Fritz's and Petitioner's requests (Pet. 96).

In his direct appeal, Petitioner argued that the trial court erred in refusing to appoint a hair comparison expert, but the Court of Criminal Appeals denied relief on the ground that due process does not require the appointment of an expert witness other than a psychiatrist. The appellate court reasoned that Petitioner had not met his burden of establishing the need for the experts, because he failed to explain undeveloped assertions in his motion. The court held that Petitioner was not prejudiced by the lack of a defense expert, because he was able to cross-examine the State's forensic experts. *Williamson*, 812 P.2d at 395–96.

---

**25.** *See* Moenssens, *Novel Scientific Evidence in Criminal Cases: Some Words of Caution*, 84 J.Crim.L. & Criminology 1, 5 (1993).

Petitioner correctly points out that the appellate court disregarded its own precedent in which it noted "the Supreme Court did not preclude the possibility that the principles of *Ake* should be extended to any expert which is 'necessary for an adequate defense.'" *Washington v. State,* 800 P.2d 252, 253 (Okla. Crim.App.1990) (citing *Ake v. State,* 778 P.2d 460, 464 n. 1 (Okla.Crim.App.1989)). More recently, the Court of Criminal Appeals has held that "the principles of *Ake* [*v. Oklahoma*] have been extended to any expert necessary for adequate defense." *Rogers v. State,* 890 P.2d 959, 966 (Okla.Crim.App. 1995). The *Rogers* opinion lists a number of cases in which the appellate court held that *Ake* may be extended to experts other than psychiatrists. *Rogers,* 890 P.2d at 966 n. 3. *Rogers* requires a defendant to "make a showing of need and show that he will be prejudiced by the lack of expert assistance." *Rogers,* 890 P.2d at 967. In *Salazar v. State,* 852 P.2d 729, 735 (Okla.Crim.App.1993), *reh'g denied,* 859 P.2d 517 (Okla.Crim.App.1993), the court included a requirement that the defendant must demonstrate on appeal that he was prejudiced by the lack of expert assistance.

In *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the United States Supreme Court held that under certain conditions the State is required to provide an indigent defendant with access to a psychiatrist:

> [W]hen a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense.... [J]ustice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake.

*Ake,* 470 U.S. at 76, 105 S.Ct. at 1092.

Prior to *Ake,* federal courts had similarly reversed convictions based on the state's failure to provide an expert witness other than a psychiatrist for an indigent defendant. In *Williams v. Martin,* 618 F.2d 1021 (4th Cir. 1980), a case in which the cause of the victim's death was at issue, the Fourth Circuit Court of Appeals held that a defense could not be fully developed without professional assistance from an independent forensic pathologist. "A complete understanding of the medical factors involved was necessary before a medical layman could effectively question the state's pathologist and test the firmness of his opinion." *Williams,* 618 F.2d at 1026. An expert defense witness could have also questioned the accuracy of the victim's autopsy and expressed a contrary opinion regarding the cause of death, raising a reasonable doubt as to the defendant's guilt. "Just as the state needed an expert to prove the cause of death, Williams needed an expert to present his defense." *Id.*

In *United States v. Durant,* 545 F.2d 823 (2d Cir.1976), the Second Circuit Court of Appeals held that where fingerprint evidence was pivotal and a defense expert could have advised whether any identification from the fingerprint was even possible, the trial court should have appointed a fingerprint expert for the defense. While this case looked at the proper standard for appointment of a defense expert under the Criminal Justice Act of 1964, 18 U.S.C. § 3006A (1970), it discussed the fact that a defense expert could have educated defense counsel about technicalities in the field, making cross-examination more effective.

The Tenth Circuit Court of Appeals examined the issue of appointment of an expert witness other than a psychiatrist in *United States v. Greschner,* 802 F.2d 373 (10th Cir. 1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987). In *Greschner* the defendant was denied the appointment of a penologist who would have testified about the dangers of living in a federal penitentiary. The court held that such appointment was not required under *Ake,* unless the requested expert services are necessary for an adequate defense. Further, the defendant has the burden of showing the necessity of the expert. In Greshner's case the trial court rejected the proffered expert's qualifications. The court also found that the same testimony could have been given by other witnesses, the proposed testimony had little probative value because the expert was not knowledgeable about the defendants' confine-

ment, and there was insufficient information about the expert's location. *Greschner*, 802 F.2d at 376–77. Petitioner's case is clearly distinguishable.

In *Little v. Armontrout*, 835 F.2d 1240 (8th Cir.1987), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988), the Eighth Circuit Court of Appeals held that the state's failure to provide an indigent defendant with a hypnotic expert violated his right to a fair trial. The main issue at trial was identification of an assailant. A police officer had hypnotized the victim and another witness to enhance their memories. The officer's training in hypnosis consisted of a four-day course at a hypnosis institute. The defendant argued that he needed his own expert in hypnosis to attack the police hypnotist's qualifications and possible improper suggestions to the witnesses. The trial court rejected his request. *Little*, 835 F.2d at 1241–42.[26]

The Eighth Circuit reversed the trial court, holding that "the denial of a state-provided expert on hypnosis to assist this indigent defendant rendered the trial fundamentally unfair and require[d] that the conviction be set aside." *Little*, 835 F.2d at 1243.

Although the expert requested was not a psychiatrist as in *Ake*, the *Little* court held

There is no principled way to distinguish between psychiatric and nonpsychiatric experts. The question in each case must be not what field of science or expert knowledge is involved, but rather *how important the scientific issue is in the case*, and how much help a defense expert could have given.

*Little*, 835 F.2d at 1243 (emphasis added).

Forensic evidence was a critical part of Petitioner's trial. As discussed above in Part IIIA, Admissibility of Hair Evidence, this court finds that the hair evidence was too unreliable to be admissible, but semen, saliva and blood testing results were also put before the jury. The question of reliability of secretor evidence is not before this court. However, this court will address the issue of whether Petitioner was entitled to a forensic expert to assist in his defense at trial.

Dennis Smith testified that on or about September 24, 1987, saliva samples were taken again from Petitioner and Fritz, and their blood was drawn for testing. These samples were forwarded to the crime bureau (Tr. 397–98).

Mary Long of the OSBI testified that one of the methods she uses to determine blood type is a secretor test which determines blood-type activity in water-based body fluids. Approximately 80% of the population secretes blood type activity (antigen activity) into body fluids such as saliva and semen (Tr. 662). She was unable to detect any antigen activity on vaginal swabs containing sperm cells from the victim's vagina. This could mean either the antigen level was too low to be detected or the source of the sample was a non-secretor. Blood from the victim's fingernails had Antigen A activity, indicative of Type A blood, the same as the victim's blood group. Long also identified Type A human blood and semen on the fitted sheet removed from the crime scene. There was no antigen activity in the semen on the sheet or semen found on the victim's panties, indicating that the source could have been a non-secretor.

Long ran tests on saliva and blood samples from Petitioner and Fritz and determined both were non-secretors with Group O blood (Tr. 669–676). She testified that she received a saliva sample from Ricky Simmons in September 1987 (Tr. 677), but the secretor testing results chart did not indicate it was ever tested (O.R. 76). Long further testified that saliva samples from Glen Gore were never submitted to her for testing (Tr. 696). In all, she ran antigen activity tests on 20 people, including the victim, and found that 12 of the samples indicated no antigen activity. She explained the disparity between the expected non-secretor rate of 20% and the sample rate of 60% could be a result of the small sample size. Long stated that her results could mean either that the non-secretor samples were insufficient or that the sources were actually non-secretors (Tr. 680–88). Excluding the victim, of the 20 individu-

---

**26.** The Missouri Supreme Court has since held that hypnotically enhanced testimony is inadmissible per se. *Alsbach v. Bader*, 700 S.W.2d 823 (Mo.1985) (en banc).

als who submitted saliva samples, she confirmed secretor status with blood tests only on Petitioner and Fritz. (Tr. 695–96).

In Petitioner's case the forensic evidence was a critical part of the prosecution. As science has increasingly entered the courtroom and begun to play an enlarging role in criminal prosecutions, the importance of the expert witness has also grown.[27] Denial of Petitioner's request for forensic expert assistance seriously affected the fundamental fairness and accuracy of the trial. As the Supreme Court discussed in *Ake v. Oklahoma,*

> [W]hile the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system." ... [W]e have required that ["the basic tools of an adequate defense or appeal"] be provided to those defendants who cannot afford to pay for them.

*Ake,* 470 U.S. at 77, 105 S.Ct. at 1093 (internal citations omitted).

The *Ake* court held that to determine whether it is necessary to provide a psychiatrist for an indigent defendant, three factors must be examined: (1) the private interest that will be affected by the State's action, (2) the governmental interest that will be affected if the safeguard is provided, and (3) the probable value of the safeguards that are sought along with the "risk of an erroneous deprivation of the affected interest" if the safeguards are denied. *Ake,* 470 U.S. at 77, 105 S.Ct. at 1093.

The analysis of Petitioner's case is no different from that in *Ake.* "The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at

risk is almost uniquely compelling." *Ake,* 470 U.S. at 78, 105 S.Ct. at 1093. The State's interest in the financial burden of providing expert assistance for Petitioner and its interest in prevailing at trial are clearly outweighed by the interest of the "fair and accurate adjudication of criminal cases." *Ake,* 470 U.S. at 79, 105 S.Ct. at 1094.

The third inquiry concerns the probable value of the forensic assistance sought and the risk of an erroneous trial outcome if the assistance is denied. As with psychiatry, certain areas of forensics are not exact sciences. Furthermore, "[t]estimony emanating from the depth and scope of specialized knowledge is very impressive to a jury. The same testimony from another source can have less effect." *Ake,* 470 U.S. at 82 n. 7, 105 S.Ct. at 1095 n. 7 (citations omitted).

As pointed out in the special concurrence by Judge Parks in Petitioner's appeal, "[O]ne need look no further than the trial of [Petitioner's] co-defendant" to see the value of a defense expert:

> In *Fritz v. State,* 811 P.2d 1353 (Okla. Crim.App.1991), the State's forensic chemistry expert testified that twelve (12) hairs found at the crime scene were microscopically consistent with hairs from Fritz. *Id.* at 1362. However, the defense's hair expert examined the same evidence and concluded that only two (2) hairs were consistent with those from Fritz. *Id.* at 1362. Furthermore, regardless of the knowledge of a defense attorney on a particular scientific subject or the thoroughness of his cross-examination of a State's expert, such cannot be reasonably said to replace the testimony from a defense witness who is deemed to be an expert in his field.

*Williamson,* 812 P.2d at 416 (Parks, J., specially concurring).[28]

---

27. *See* West, *Expert Services and the Indigent Criminal Defendant: The Constitutional Mandate of Ake v. Oklahoma,* 84 Mich.L.Rev. 1326 (1986).

28. This court notes that Hett apparently changed his testimony not only about the number of hairs found at the crime scene that were allegedly consistent with Fritz's known hair, but also regarding where these questioned hairs were found. As noted earlier in this Order, Hett testi-

fied in Petitioner's trial that he found thirteen (13) hairs consistent with Fritz's known hair. At Fritz's trial Hett testified that the two questioned scalp hairs that were allegedly consistent with Fritz's known scalp hair were found on the washcloth. *Fritz* 811 P.2d at 1362. However, Hett's testimony at Petitioner's trial was that these questioned scalp hairs were found on the bedding and the floor (Tr. 734).

This court disagrees that cross-examination of the State's experts was an acceptable substitute for Petitioner's own experts. Unless the defendant's attorney is learned in the expert's field, cross-examination will hardly suffice. Expert witnesses can stray outside the boundaries of their expertise, but a defendant's attorney may not be able to recognize misrepresentations or errors in methodology.[29] Only the defendant's own expert can assure the indigent accused an adequate defense in cases where expert testimony plays a key role in the prosecution.[30]

Both the Tenth Circuit Court of Appeals in *Greschner*, 802 F.2d at 376, and the Oklahoma Court of Criminal Appeals in *Rogers*, 890 P.2d at 967, require the indigent defendant to make a showing of need for the requested expert assistance. *Rogers* further requires a showing that the defendant will be prejudiced by denial of the requested expert. *Id.* The State argues that Petitioner merely adopted all of his co-defendant's motions, and those included a request for forensic experts. However, the record reflects Petitioner also adopted Fritz's oral argument in support of the motion (09/08/87 M. Tr. 3). While the State asserts that no explanation or supporting argument was presented to the court, the record does not indicate the content of Fritz's oral argument. Whether a showing was made is unknown.

Based on the foregoing reasons, it is this court's holding that when forensic evidence and expert testimony are critical parts of the criminal prosecution of an indigent defendant, due process requires the State to provide an expert who is not beholden to the prosecution. The fact that forensic evidence and expert testimony are crucial to the prosecution is in and of itself a sufficient showing of the need for expert assistance and that the defendant would be prejudiced without it.[31]

## IV. BRADY ISSUES

In Ground VI, Petitioner asserts the State's failure to provide trial defense counsel with exculpatory evidence resulted in a denial of Petitioner's constitutional rights under the Sixth and Fourteenth Amendments. Specifically, Petitioner complains his defense counsel was not provided a 1983 videotape of exculpatory statements made by Petitioner following a polygraph examination administered by an OSBI agent. Respondent admits, and the record reflects, that Petitioner has exhausted his state remedies in regard to this allegation.

 Petitioner asserts that the prosecution failed to provide exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Before analyzing the application of *Brady*, this court must first clarify the factual background in which this allegation of error is cast. Respondent argues without reference to the record that the videotape was provided to Petitioner's defense counsel, and defense counsel had an opportunity to make use of the videotaped statement during trial. Petitioner, to the contrary, contends his defense counsel was not made aware of the 1983 videotaped statement of Petitioner until cross-examination of OSBI Agent Rogers during trial in April 1988, and he was not actually given the videotape until after the trial. Petitioner refers to a post-trial hearing before the trial judge on April 29, 1988, which verifies Petitioner did not gain access to the videotape until forty-eight (48) hours after conclusion of the first stage of trial (Tr. 485–491, 494; 4/29/88 M. Tr. 5–6; Pet., App. K, Affidavit of Defense Counsel). Thus, the record clearly supports Petitioner's contention that the 1983 videotape was not in fact made available to trial defense counsel until the 29th of April 1988 at the post-trial hearing before the trial judge (4/29/88 M. Tr. 5–6).

29. Moenssens, 84 J.Crim.L. & Criminology at 7–8.

30. *See* West, 84 Mich.L.Rev. at 1353–54.

31. This court takes special note that Petitioner's trial attorney is blind. Because defense counsel was a local practitioner, the trial court was undoubtedly aware of this fact. While this court is not proposing that any special consideration should have been afforded defense counsel due to his disability, it is unreasonable to suggest that he could have examined the State's forensic reports, much less interpreted them, without assistance from a forensic expert.

The *Brady* decision held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–1197. In *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), the Court described material evidence as follows: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Additionally, the *Bagley* court advised, " '[A] reasonable probability' " is " 'a probability sufficient to undermine confidence in the outcome.' " *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383 (citing *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984)). Further, the Tenth Circuit Court of Appeals recently held, "[I]n order to establish a *Brady* violation, the defendant bears the burden of establishing: '1) that the prosecution suppressed the evidence; 2) that the evidence was favorable to the accused; and 3) that the evidence was material.' " *Smith v. Secretary of N.M. Dept. of Corrections*, 50 F.3d 801, 824 (10th Cir.1995) (citations omitted).

Apparently, Respondent does not contest Petitioner's assertion his attorney made proper pretrial motions to obtain all of Petitioner's statements made to police investigators. (07/10/87 M. Tr. 2–3, Request for Results of Polygraph; P.H. Tr. 243–249; 07/28/87 M. Tr. 45–49; 09/04/87 M. Tr. 25–29, 31; O.R. 106, 211–216). Also, the record reflects the trial court, at a hearing on September 4, 1987, directed the prosecution to provide defense counsel all statements made by Petitioner to police during the investigation of the murder of Debbie Carter. (Motion, 09/04/87 Tr. 27–29, 31). Respondent, while admitting the 1983 videotape is exculpatory (R.Br. 58), argues the facts of this case do not involve a denied disclosure, but rather a delayed disclosure, despite the clear record indicating otherwise. To support the delayed disclosure position Respondent cites

several cases from other circuits. *United States v. Ingraldi*, 793 F.2d 408, 411–412 (1st Cir.1986); *Nassar v. Sissel*, 792 F.2d 119, 121 (8th Cir.1986); *United States v. Boschetti*, 794 F.2d 416, 418 (8th Cir.1986), *cert. denied*, 479 U.S. 889, 107 S.Ct. 289, 93 L.Ed.2d 263 (1986); *United States v. Johnston*, 784 F.2d 416, 425 (1st Cir.1986); *United States v. Xheka*, 704 F.2d 974 (7th Cir.1983), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983). This court has reviewed those cases and finds them to be distinguishable from the case before the court. The cases cited by Respondent deal with factual circumstances where exculpatory evidence discovered during trial was available as defense evidence and/or use during cross-examination of prosecution witnesses.

This court finds and the respondent admits that the 1983 videotape is exculpatory. Since the record reflects it was not provided to Petitioner's counsel until after trial, it goes without comment that Petitioner has met his burden of establishing: (1) the prosecution suppressed evidence; and (2) the evidence suppressed was favorable to the accused.

■ To complete the third step of *Brady*, this court must determine whether Petitioner has met the materiality test described in *Bagley*. The Oklahoma Court of Criminal Appeals supplemented its opinion in *Williamson v. State*, 812 P.2d 384 (Okla.Crim. App.1991) by order dated September 9, 1991, making the following additional findings:

> The failure of the prosecution to produce the video tape, in light of Appellant's request, was error. Evidence of the defendant's polygraph examination wherein he denies complicity in a crime is exculpatory to the defense. However, we do not find the video tape material to the Appellant's defense.

*Williamson v. State*, 905 P.2d 1135, 1136 (Okla.Crim.App.1991).[32]

This court respectfully disagrees with the Oklahoma Court of Criminal Appeals' finding. As suggested in *Bagley*, there is a

---

**32.** The Court of Criminal Appeals issued this "Correction Order," because it failed to address the *Brady* issues in its original opinion. This court notes that the correction order has not yet been published or incorporated into the original opinion.

reasonable probability that had the 1983 tape been disclosed to Petitioner's defense counsel, the result of the trial and/or sentencing would have been different.

The court's review of the 1983 videotaped session with OSBI Agent Featherstone reveals an interview in excess of two hours. Time sequence displays on the tape precisely depict the following:

00:00–28:00 Preliminary discussions concerning background of Debbie Carter's homicide, miscellaneous personal conversation between the agent and Petitioner, and questions and answers about Petitioner's medical history

28:22–29:50 Petitioner advised of *Miranda* Rights/Execution of written waiver of *Miranda* Rights

29:55–1:11:50 Further Interview/Interrogation

1:11:50–1:28:15 Polygraph Examination

1:28:15–2:04:04 Interview/Interrogation

At approximately 1:48 of the interview, Petitioner responding to questions from Agent Featherstone about the alleged Norman, Oklahoma, kidnapping incident involving co-defendant Fritz. This court notes that Petitioner's testimony is consistent with that of aggravation witness L.B.

This court must determine what effect, if any, suppression of the interview had on Petitioner's conviction, and what impact, if any, the withheld evidence had on the penalty phase of the trial resulting in Petitioner's receiving the death penalty. *Chaney v. Brown,* 730 F.2d 1334 (10th Cir.1984), *cert. denied,* 469 U.S. 1090, 105 S.Ct. 601, 83 L.Ed.2d 710 (1984).

This court concurs with Petitioner's assertion that the "prosecution was built around a series of alleged admissions from Mr. Williamson." (Pet. 121). Impeachment of the prosecution's "admission" witnesses, therefore, was critical to Petitioner's defense. "[B]ecause impeachment is integral to a defendant's constitutional right to cross-examination, there exists no pat distinction between impeachment and exculpatory evidence under *Brady*." *Smith v. Secretary of N.M. Dept. of Corrections,* 50 F.3d at 825

(citing *Ballinger v. Kerby,* 3 F.3d 1371, 1376 (10th Cir.1993)).

The critical admissions came through testimony from the following prosecution witnesses: Terri Holland, an inmate with Petitioner in the Pontotoc County Jail from October 1984 until January 1985, who allegedly overheard statements and conversation by Petitioner (Tr. 573–93) (See more complete discussion of Holland testimony in Part IIB, Terri Holland's Motivation to Testify, of this Order); Gary Rogers, OSBI agent who testified about a dream confession made by Petitioner on May 9, 1987 (Tr. 435–500); Pontotoc County Jailers Mike Tinney and John Christian who, in their related testimony, indicated Petitioner made statements in May 1987 and July 1987 implicating Petitioner in the murder of Debbie Carter (Tr. 598–609, 610–615); and Cindy McIntosh, an inmate with Petitioner at the Pontotoc County Jail in July 1987, who related incriminating conversations between Petitioner and co-defendant Fritz following a preliminary hearing session (Tr. 594–596). The credibility of these prosecution witnesses is the key to the prosecution's case against the Petitioner. The prosecution's closing argument encouraging the jury to rely on the testimony of the "admission" witnesses verifies the prosecution's need for the jury to believe their testimony (Tr. 912–916, 921–936, 941).

The admission testimony gave the prosecution the great advantage of being able to argue Petitioner literally admitted his involvement in the murder of Debbie Carter. Without the 1983 videotape, Petitioner's counsel was in the unenviable position of having only Petitioner's trial testimony to rebut the testimony of four prosecution witnesses. If the 1983 videotape had been accessible during trial, defense counsel could have countered the prosecution's testimony regarding alleged *oral* admissions with the powerful tool of *visual* evidence of Petitioner's denials. With the videotape Petitioner's counsel could have argued strongly that his client's courtroom denial under oath in 1987 was consistent with his 1983 videotape denial, and the videotape was more credible than the prosecution's testimony based on memory unverified by written statement, audio, or

video recording. After reviewing the 1983 videotape, it is clear to this court that had Petitioner's counsel been made aware of all aspects of the 1983 videotape before trial, there very likely would have been a much different trial strategy. There is no doubt that OSBI Agent Rogers would have been subject to a much more thorough cross-examination on the issues of (1) no written, audio or video waiver of *Miranda* Rights; (2) failure on direct examination to relate to the jury that Petitioner denied involvement in Debbie Carter's murder twice before the alleged dream confession in 1987; and (3) why he videotaped the denial but did not videotape the alleged confession.

Also, the withheld videotape denied Petitioner possible trial strategy relating to utilization of the Simmons confession, more completely discussed in Part IIC, Confession of Ricky Simmons, and development of Glen Gore as an alternative suspect in the murder of Debbie Carter, discussed in Part IIA, Glen Gore.

■ Next, the court must determine whether the withheld evidence affected the jury's determination during the penalty phase of Petitioner's case. In *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (citing *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978)), the Supreme Court held:

> [T]he Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and *any of the circumstances of the offense* that the defendant proffers as a basis for a sentence less than death.

Review of the 1983 videotape, as it relates to sentencing, causes this court to find that Petitioner's case in mitigation was compromised. In the case for conviction, the prosecution centered on "admission" witness testimony of questionable credibility. Similarly, the penalty phase of Petitioner's trial is centered on aggravation contentions supported only by uncharged misconduct that took place from five to seven years before Petitioner's April 1988 trial. The dialogue elicited from Petitioner during the 1983 videotape established: (1) Petitioner's emphatic denial

of participation in the murder of Debbie Carter; (2) statements consistent with aggravation witness L.B. about his passive involvement in the alleged kidnapping involving co-defendant Dennis Fritz; and (3) revelation of medical history admitting possible significant mental problems. The consistency of Petitioner's 1983 testimony with the 1988 testimony of L.B. would have given defense counsel an opportunity to suggest to the jury that co-defendant Fritz played the primary role in the murder of Debbie Carter. The importance of Petitioner's 1983 testimony concerning the L.B. kidnapping, when viewed in context with this court's comments in Part VB, Penalty Stage/Statutory Aggravators, illuminates the reasons why at least portions of the 1983 tape should have been available to the jury during sentencing.

Although Petitioner's defense counsel should have had more than adequate notice of Petitioner's mental health problems, Petitioner's oral description of his medical history is exculpatory to the extent it confirms a great deal of the written record discussed more completely in Part IA of this Order, Ineffective Counsel. The withheld 1983 videotape is mitigating as to sentencing, because it relates to the credibility of the prosecution's case as a whole, and it tends to support inferences that others were involved in the murder of Debbie Carter and that Petitioner may have had a diminished mental capacity. It has been well established by the Supreme Court in *Lockett* and *Eddings* that a defendant has a right to suggest during mitigation in the sentencing phase of a trial that a possible third person might have committed the crime with which the defendant is charged.

After reviewing the 1983 videotape, this court finds that if it had been provided to defense counsel, he would have been prompted to develop a sentencing phase strategy which would have at least dulled the sting of the prosecution's blistering, uncharged misconduct aggravation testimony leading to Petitioner's receiving the death penalty. Thus, the court finds denial of the tape affected the jury's determination on both the conviction and penalty phases of the trial. *Bagley*, 473

U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1984).

## V. JURY INSTRUCTIONS

### A. Guilt Stage

#### Instruction on Manslaughter

■ A defendant in a murder case is entitled to an instruction on the lesser included offense of first degree manslaughter when there is evidence in the record suggesting that he was in such a state of intoxication that there is a reasonable doubt as to whether he could have formed the specific intent to kill. *Williams v. State*, 513 P.2d 335, 339 (Okla.Crim.App.1973); *Gibson v. State*, 501 P.2d 891, 899–900 (Okla.Crim.App.1972); *Tarter v. State*, 359 P.2d 596, 600–601, 606 (Okla.Crim.App.1961).

■ During Petitioner's trial the State presented evidence in the form of a dream Petitioner allegedly told a jailer at the Pontotoc County Jail. In the dream Petitioner related he had been ingesting drugs and alcohol the entire day before arriving at the Coach Light Club (Tr. 612–613).[33] Further evidence introduced by the State indicated more alcohol consumption after Petitioner arrived at the club (Tr. 601). Other alleged admissions relied upon by the prosecution did not contradict this claim (Tr. 328, 331–332, 449, 574). Accordingly, the State's own evidence indicated Petitioner killed Ms. Carter after a full day of drug and alcohol ingestion, and even more alcohol consumption after he entered the Coach Light Club. Moreover, the physical evidence at the murder scene was not inconsistent with a homicide committed in the course of a drunken rage. Therefore, the court finds Petitioner was entitled to an instruction on manslaughter in the first degree.[34]

Respondent argues that because Petitioner testified he did not kill the victim, he was no longer entitled to instructions on the lesser degrees of homicide, because his testimony foreclosed all issues except his guilt or innocence. *See Spuehler v. State*, 709 P.2d 202, 204 (Okla.Crim.App.1985); *Seegars v. State*, 655 P.2d 563, 565 (Okla.Crim.App.1982). In *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), the Supreme Court dealt with the analogous issue of inconsistent defenses. At trial, Matthews had attempted to assert the defense of entrapment, but the trial court refused to instruct the jury on that defense because it was inconsistent with Matthews' claim that he had no intent to commit the crime charged. The Supreme Court reversed the resulting conviction holding that Matthews was entitled to assert the defense as long as the evidence supported it, regardless of any inconsistency between entrapment and any other defense. *Mathews*, 485 U.S. at 59–60, 108 S.Ct. at 885. Accordingly, Petitioner was entitled to instructions on the defenses and lesser included offenses supported by the evidence whether or not they were inconsistent with each other.

Respondent also contends that even if Petitioner was entitled to an instruction on First Degree Manslaughter, such a defense was barred by the statute of limitations. The Oklahoma Court of Criminal Appeals did in fact find that this instruction was barred by the statute of limitations. *Williamson*, 812 P.2d at 399. The court relied on *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), and held that the jury could not be "tricked into believing that it has a choice of crimes for which to find defendant guilty, if in reality there is no choice." *Williamson*, 812 P.2d at 399 (citing *Spaziano*, 468 U.S. at 457, 104 S.Ct. at 3160). This sentence, however, stops short of the full holding, is taken out of context, and does not accurately reflect the rationale of the

---

33. Inexplicably, the State chose to present only a portion of Petitioner's "dream." The dream also included a statement that Petitioner lived in Tulsa, Oklahoma, at the time of the murder, when, in fact, he resided with his mother in Ada, Oklahoma (Tr. 612–613).

34. The record does not indicate that counsel requested a first degree manslaughter instruction. However, the court notes that the trial court has an independent duty to instruct the jury on all degrees of homicide which the evidence tends to prove whether or not such instructions are requested. *See Penny v. State*, 765 P.2d 797 (Okla.Crim.App.1988); *Walton v. State*, 744 P.2d 977, 978 (Okla.Crim.App.1987); *Mayberry v. State*, 94 Okla.Crim. 301, 238 P.2d 362, 366–67 (1951).

Supreme Court. In *Spaziano* the Court elaborated on the possibility of the jury's reaching a verdict on a charge which is actually barred by the statute of limitations. The Supreme Court held:

> If the jury is not to be tricked into thinking that there is a range of offenses for which the defendant may be held accountable, then the question is whether *Beck* requires that a lesser included offense instruction be given, with the defendant being forced to waive the expired statute of limitations on those offenses, or whether the defendant should be given a choice between having the benefit of the lesser included offense instruction or asserting the statute of limitations on the lesser included offenses. We think the better option is that the defendant be given the choice.

■ Petitioner was not given a choice, and, therefore, the conviction must be reversed.[35] In a capital conviction a sentence of death cannot be imposed where the jury was not permitted to consider a verdict of guilt of a lesser included offense when the evidence would have supported such a verdict. *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

### *Unanimous Verdict*

■ Petitioner was charged with malice aforethought murder and felony murder, two alternative counts of first degree murder (O.R. 276). In its first stage jury instructions the trial court explained the elements of both counts (Supp. O.R. 9–11) and informed the jury that its verdict had to be unanimous (Supp. O.R. 20). However, the court did not explain that there had to be a unanimous finding on either count. Further complicating the matter, the court provided a guilty verdict form which did not distinguish between the two alternative counts (O.R. 329). Therefore, it is entirely possible that the jurors may not have arrived at a unanimous verdict as to either count of murder.

This situation was exacerbated by the argument of the prosecutor that the jurors

could find Petitioner guilty even if six jurors thought Petitioner was guilty of malice aforethought murder while the other six thought that Petitioner was guilty of felony murder. In his closing argument the prosecutor stated:

> Ladies and gentlemen, you can all agree to Count One, that's murder in the First Degree. You can agree all agree to Count Two, that's Murder in the First Degree, *or you don't have to agree on which one it is. It's still Murder in the First Degree. Six could think its malice aforethought murder; six could think it's felony murder, and it's still Murder in the First Degree, any way you cut it.*

(Tr. 941) (emphasis added).

The Supreme Court has held that a jury's verdict of guilt must be set aside if it could be supported on one ground but not on another, and the reviewing court is uncertain which of these two grounds was relied upon by the jury in reaching a verdict. *See Mills v. Maryland,* 486 U.S. 367, 376, 108 S.Ct. 1860, 1866, 100 L.Ed.2d 384 (1988). "Review of death penalty sentences demands even greater certainty that the jury's conclusions rested on proper grounds." *Mills,* 486 U.S. at 375–376, 108 S.Ct. at 1866. Additionally, Article II, § 19 of the Oklahoma Constitution requires unanimous verdicts in felony cases.

Petitioner could not be found guilty of first degree murder unless the jury unanimously found that he either killed the deceased with malice aforethought or killed her in the course of the alleged rape. Okla.Stat. tit. 21, §§ 701.7(A) and (B) (1982). If the trier of fact did not make either of these findings, then Petitioner has not constitutionally been found guilty of murder in the first degree.

There are at least two scenarios presented by the facts in this case which could negate the intent requirement necessary for malice aforethought murder. First, there is the possibility the jury could have been convicting Petitioner of felony murder only. Since Petitioner was charged conjointly with another (Tr. 290), there is the potential some

---

**35.** This court notes that the almost five year delay in charging Petitioner with this offense surpassed the three year statute of limitations for First Degree Manslaughter. *See* Okla.Stat. tit. 22, § 152.

members of the jury believed Petitioner was merely an accomplice in the alleged rape. Second, evidence of intoxication and drug abuse presented by the State, if believed by the jury, could have negated any intent required for malice aforethought murder. *Cf. United States v. Bedonie,* 913 F.2d 782, 792 (10th Cir.1990), *cert. denied,* 501 U.S. 1253, 111 S.Ct. 2895, 115 L.Ed.2d 1059 (1991) (defendants not deprived of their right to a unanimous verdict because there was no evidence presented from which the jury could have concluded that Defendants killed without premeditation). Therefore, there is the possibility that the jury was split in their determination of guilt.

The trial court instructed the jury that it could not consider the imposition of the death penalty unless it first determined that Petitioner "killed the person, ... attempted to kill such person, intended that such killing take place, was a major participant in the felony committed combined with a reckless indifference to human life or that lethal force should be employed." (Supp.O.R.27–28). However, the trial court did not provide any mechanism for the jury to record which of these factors it found. Further, the court did not inform the jury that it had to agree unanimously on any factor or factors. Given the instructions concerning the alternative murder counts and the prosecutor's explanation during his closing argument, the jurors could have concluded they were free to find guilt and impose the death penalty, although they were split among themselves over the very elements of the crime.

 The ultimate question is whether there is a reasonable possibility that the jury understood the instructions in an unconstitutional manner. *Francis v. Franklin,* 471 U.S. 307, 324 n. 8, 105 S.Ct. 1965, 1976 n. 8, 85 L.Ed.2d 344 (1985). *See also Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (recognizing that the instructions are but one of several components of the trial which may result in the judgment of conviction, including argument of counsel). "Death is different in kind from all other criminal sanctions, and because of that qualitative difference, there is a corresponding difference in the need for reliability and the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). This court has carefully considered the need for reliability in the review of the jury instructions in Petitioner's case and concludes that there is a reasonable possibility that the jurors could have understood or followed the instructions in an unconstitutional manner.

### B. Penalty Stage/Statutory Aggravators

#### Notice

 In Ground XII Petitioner alleges that the State's failure to provide sufficient and timely notice of the evidence in support of the statutory aggravators was fundamental error. The State asserts that the information given to the defense provided sufficient notice.

Okla.Stat. tit. 21, § 701.10 provides that in the sentencing phase of a trial for murder in the first degree, "only such evidence in aggravation as the state has made known to the defendant prior to his trial shall be admissible." Although the State alleges in its response that Petitioner received notice of second stage witnesses from the Amended Information, that document only lists Gary Rogers, Dennis Smith and Charles Carter as witnesses (O.R. 14–15). A Bill of Particulars in Rem Punishment was filed on June 9, 1987, without specific indication of the evidence the prosecution intended to offer to prove the aggravators (O.R. 19). On September 21, 1987, the State filed a motion to endorse additional witnesses including A.C. (O.R. 142). Petitioner responded to the motion on October 7, 1987 (O.R. 150). The district court granted the motion to endorse on November 9, 1987 (O.R. 194). On April 20, 1988, one day before trial, the State filed its notice of evidence to be offered during the punishment stage of Petitioner's trial (O.R. 319). There was no certificate of service indicating the defense received its copy prior to trial.

On April 20, 1988, the State's notice of evidence listed five possible witnesses who

would testify about Petitioner's prior conduct. A.C., known as A.H. at the time of trial, was one of those witnesses. She testified in the sentencing phase that in January 1981 Petitioner assaulted and threatened to kill her over a four-hour period. Although not listed in the State's notice, A.H. testified that she sustained two "puncture" wounds on her face "like a snake bite." She believed they came from a horse-head ring Petitioner wore during the alleged assault (Tr. 993–94). In its closing argument the State pointed out that the victim in this case had "punctate" wounds on her face and compared them to A.H.'s injuries (Tr. 1016). The State used A.H.'s testimony about her wounds to tie A.H.'s alleged assault to Debbie Carter's murder. The prosecutor closed by saying that "[Petitioner] left his signature on [A.H.], and he underlined it with Debbie Carter." (Tr. 1027).

■■■ The Oklahoma Court of Criminal Appeals has held that the State is not required to give a detailed description of evidence it intends to offer in accordance with Okla.Stat. tit. 21, § 701.10. *Wilson v. State*, 756 P.2d 1240, 1245 n. 1 (Okla.Crim.App. 1988). However, the United States Supreme Court has held that denial of a defendant's opportunity to meaningfully deny or explain evidence used to procure a death sentence is a denial of due process. *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977). This detail of A.H.'s testimony regarding her "puncture" wounds was crucial, and Petitioner should have had the opportunity to adequately prepare his defense to it.

■■■ In addition to the allegation that the notice of A.H.'s testimony was inadequate in content, Petitioner also alleges that the notice was not timely. The Court of Criminal Appeals has recently addressed whether defense counsel had adequate time to prepare for a death penalty trial. Holding that eighteen days was not enough time, the court stated, "The trial of a case, especially a death case, is not a game." *Marquez v. State*, 890 P.2d 980, 983 (Okla.Crim.App. 1995). This court finds that the due process requirement of adequate time to prepare ap-

plies to the penalty portion of a death penalty case as well as the guilt stage.

"Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees." *Estelle v. Smith*, 451 U.S. 454, 463, 101 S.Ct. 1866, 1873, 68 L.Ed.2d 359 (1981). "[F]undamental principles of procedural fairness apply with no less force at the penalty phase of a trial in a capital case than they do in the guilt-determining phase of any criminal trial." *Presnell v. Georgia*, 439 U.S. 14, 16, 99 S.Ct. 235, 236–237, 58 L.Ed.2d 207 (1978).

Recognizing that due process requires the defendant be given adequate notice of aggravating circumstances, the Court of Criminal Appeals has stated:

Under our state death penalty scheme, the defendant is afforded due process rights of notice and opportunity to be heard, in that he receives notice not only of the aggravating circumstance alleged against him, but also of the evidence to be used to support those aggravators. The defendant then has the opportunity to prepare to meet and rebut this evidence at trial.

*Paxton v. State*, 867 P.2d 1309, 1322 (Okla. Crim.App.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994).

"The purpose of notice prior to trial is to allow the defendant time to present a defense or explanation for alleged criminal misconduct." *Wilson v. State*, 756 P.2d 1240, 1245 (Okla.Crim.App.1988) (citing *Johnson v. State*, 665 P.2d 815, 823 (Okla.Crim.App. 1982)). Therefore, this court holds that giving Petitioner only one day's notice of aggravating circumstances was a denial of due process and was fundamental error.

### Continuing Threat to Society/Objection to Vagueness

■■■ The jury in Petitioner's case made no findings concerning the continuing threat aggravator (O.R. 365), and it was not required to find the existence of any particular fact or set of circumstances in order to find the existence of this aggravator. The jury instructions related the bare statutory language of Okla.Stat. tit. 21, § 701.12(7)

(1981) [36], but supplied no other guidance on the definition or application of that language (Supp.O.R. 21, 23). After a review of Oklahoma case law, this court concludes that it is impossible to determine what type of conduct is excluded from coming within the purview of this aggravator.

> Objections to vagueness challenges under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk. Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis.

*Maynard v. Cartwright,* 486 U.S. 356, 361, 108 S.Ct. 1853, 1857, 100 L.Ed.2d 372 (1988). *See also United States v. Powell,* 423 U.S. 87, 92–93, 96 S.Ct. 316, 319–320, 46 L.Ed.2d 228 (1975); *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975); *Palmer v. City of Euclid,* 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971).

> Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails to adequately inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman v. Georgia,* 408 U.S. 238 [92 S.Ct. 2726, 33 L.Ed.2d 346] (1972).... Since *Furman,* our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action.

*Cartwright,* 486 U.S. at 361–362, 108 S.Ct. at 1858.

In *Battenfield v. State,* 816 P.2d 555 (Okla. Crim.App.1991), *cert. denied,* 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992), the Oklahoma Court of Criminal Appeals delineated three independent sets of facts that will support a finding of the "continuing threat to society" aggravator; (1) the defendant has participated in other unrelated crimes; (2) the nature of the homicide exhibits the defendant's calloused nature; and (3) the defendant has previously been convicted of a crime involving violence. *Id.* at 566. Despite this pronouncement, the Oklahoma court has never required that juries be instructed to consider only the three sets of facts described in *Battenfield.* Any attempt to construe the language of "continuing threat" to limit it to certain sets of facts is meaningless, if the construction is not conveyed to the jury in a capital sentencing proceeding.

More important, even in *Battenfield,* the court elaborated and ultimately held that evidence to support the continuing threat aggravator is not limited to these three factual scenarios. The court observed that the State "may present any relevant evidence in conformance with the rules of evidence ... including evidence from the crime itself, evidence of other crimes, admissions by the defendant of unadjudicated offenses or any other relevant evidence." *Battenfield,* 816 P.2d at 566 (quoting *Liles v. State,* 702 P.2d 1025, 1031 (Okla.Crim.App.1985)).

A survey of Oklahoma cases reveals that Oklahoma capital opinions have never defined what particular evidence might support the continuing threat aggravating circumstance or what factors a jury must find before it may be determined that a defendant will be a continuing threat to society. Many cases hold that the aggravating factor is justified *solely* due to the "calloused" nature of the murder, the circumstances surrounding the offense, or the attitude of the defendant. *See Brown v. State,* 871 P.2d 56, 77 (Okla. Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 517, 130 L.Ed.2d 423 (1994) (evidence of ill-will toward victim, that defendant bore a grudge against his former wife, and his attitude of blaming everyone else for his

---

**36.** Okla.Stat. tit. 21, § 701.12(7) reads in pertinent part:

"Aggravating circumstances shall be ...

7. The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society ..."

mistakes); *Fisher v. State,* 736 P.2d 1003, 1009 (Okla.Crim.App.1987) (nineteen-year-old boy found to be "continuing threat to society" based on fatal stab wound to victim); *Ross v. State,* 717 P.2d 117, 123–24 (Okla.Crim.App. 1986) (uncorroborated accomplice testimony about another alleged murder involving the defendant); *See also Banks v. State,* 701 P.2d 418, 426 (Okla.Crim.App.1985) (evidence of prior convictions); *Robison v. State,* 677 P.2d 1080, 1088 (Okla.Crim.App.1984), *cert. denied,* 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984) (manner of crime's commission sufficient); *Stafford v. State,* 665 P.2d 1205, 1217–18 (Okla.Crim.App.1983), *vacated on other grounds,* 467 U.S. 1212, 104 S.Ct. 2651, 81 L.Ed.2d 359 (1984) (despite lack of prior criminal acts of violence, circumstances of offense alone sufficient to support finding); *Stafford v. State,* 669 P.2d 285, 299 (Okla.Crim.App.1983) *vacated on other grounds,* 467 U.S. 1212, 104 S.Ct. 2652, 81 L.Ed.2d 359 (1984); *Ake v. State,* 663 P.2d 1, 11 (Okla.Crim.App.1983) (manner of crime's commission sufficient), *rev'd on other grounds,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). However, in seeming contradiction the Oklahoma Court of Criminal Appeals has recently held this aggravating factor is *not* justified absent evidence of prior crimes or unadjudicated offenses. *Perry v. State,* 893 P.2d 521, 536–37 (1995).

Thus, this court finds that the failure to limit the sentencer's discretion through appropriate objective instructions, combined with Oklahoma's standardless construction of the aggravating circumstance, render this aggravating circumstance vague and a violation of Petitioner's constitutional right to due process.

### *Unadjudicated Crimes*

■ In the penalty stage of Petitioner's trial all the evidence the State presented to establish the statutory aggravators consisted of unadjudicated conduct. Oklahoma allows unlimited use of this evidence at the sentencing stage of capital trials. *See Paxton v. State,* 867 P.2d 1309, 1321–1323 (Okla.Crim. App.1993); *Woodruff v. State,* 846 P.2d 1124, 1141–1143 (Okla.Crim.App.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993). However, eight states currently prohibit the use of this type of evidence. These eight states are Alabama, Florida, Indiana, Maryland, Ohio, Pennsylvania, Tennessee and Washington.[37] Ten states place restrictions on its use. Those ten states are Arkansas, California, Delaware, Georgia, Illinois, Louisiana, Nebraska, Nevada, South Carolina and Utah.[38] "While

**37.** Smith, *Unreliable and Prejudicial: The Use of Extraneous Unadjudicated Offenses in the Penalty Phase of Capital Trials,* 93 Colum.L.Rev. 1249, 1277–82 (1993), citing the following cases as examples: *State v. Bobo,* 727 S.W.2d 945, 952–954 (Tenn.1987), *cert. denied,* 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987) (admission of unadjudicated offenses would violate a number of state constitutional guarantees, including the right to trial by impartial jury, to an indictment or presentation, to confrontation, and against self-incrimination; it would essentially result in a procedure so unfair and prejudicial as to violate due process); *State v. McCormick,* 272 Ind. 272, 397 N.E.2d 276 (1979) (statute allowing admission of unadjudicated offense only if state proves defendant committed it beyond a reasonable doubt at the sentencing stage is still unconstitutional, as defendant would in essence be "tried" of the second murder before a jury which has been undeniably prejudiced by having convicted him of an unrelated murder); *Cook v. State,* 369 So.2d 1251, 1257 (Ala.1978) (defendants are presumed innocent until convicted—this fundamental tenet prohibits use against an individual of unproven charges in the life or death situation presented at the sentencing stage of a capital

trial); *Commonwealth v. McCoy,* 405 Pa. 23, 32, 172 A.2d 795, 799 (1961); *Commonwealth v. Hoss,* 445 Pa. 98, 118, 283 A.2d 58, 69 (1971); *Johnson v. State,* 292 Md. 405, 440–43, 439 A.2d 542, 562–63 (1982); *Scott v. State,* 297 Md. 235, 246–53, 465 A.2d 1126, 1133–36 (1983); *Provence v. State,* 337 So.2d 783, 786 (Fla.1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977).

**38.** *Id.* at 1271. Various courts have allowed the sentencer to consider unadjudicated offenses only once the sentencer has found the offense was committed beyond a reasonable doubt. *See People v. Balderas,* 41 Cal.3d 144, 204, 711 P.2d 480, 516, 222 Cal.Rptr. 184, 219 (1985); *Miller v. State,* 280 Ark. 551, 553–55, 660 S.W.2d 163, 165 (1983). Others require the sentencer to decide by clear and convincing evidence that the evidence of unadjudicated offenses is reliable. *See State v. Brooks,* 541 So.2d 801, 814 (La. 1989); *State v. Cohen,* 1992 WL 131773 (Del.Super.Ct. Apr. 21, 1992). Nevada restricts the use of this evidence to proof of the existence of matters relevant to sentencing but not to prove the existence of a statutory aggravating circumstance. *Crump v. State,* 102 Nev. 158, 160, 716

it is true that a two-thirds majority of states (sixteen) considering the issue have rejected a per se bar on the introduction of this type of evidence, it is also true that more than two-thirds of the states (eighteen) have deemed unrestricted use of the evidence unacceptable." *Paxton,* 867 P.2d at 1332 n. 3 (Chapel, J., dissenting).

The United States Supreme Court has yet to decide this issue. However, at least two former Supreme Court Justices have found the admission of this evidence offensive. *See Williams v. Lynaugh,* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 270 (1987) (Marshall, J. joined by Brennan, J., dissenting from denial of certiorari), stating that "imposition of the death penalty in reliance on mere allegations of criminal behavior fails to comport with the constitutional requirement of reliability." *Williams,* 484 U.S. at 938, 108 S.Ct. at 313. Justices Marshall and Brennan further warn there is serious doubt whether a state may ever introduce such evidence consistent with Eighth and Fourteenth Amendments, given the Supreme Court's jurisprudence determining death is qualitatively different from other punishments. *Id.* at 939, 108 S.Ct. at 314. *See also Coleman v. Risley,* 839 F.2d 434, 504 (9th Cir.1988) (Reinhardt, J., dissenting) (because of the importance of the "quality" of the information relied on by a capital sentencer, and because of the centrality of the defendant's record in capital sentencing, the Constitution does not permit the capital sentencer to rely on unadjudicated offenses).

. . . It is both cruel and unusual to allow a jury to sentence someone to death in a manner which results in this Court's inability to determine whether the sentence was properly imposed for the present conviction, or improperly imposed for an unadjudicated crime for which the defendant never received a fair trial. Such arbitrariness fails to comport with both the United States Supreme Court's and this Court's death penalty jurisprudence.

*Paxton,* 867 P.2d at 1333 n. 5 (Chapel, J., dissenting).

Here, the evidence of unadjudicated crimes consisted of testimony which, if believed by the jury, could have constituted assault, battery, kidnapping, and attempted rape. Consequently, Petitioner was required to defend against these additional allegations, although no formal charges were ever filed.

This court finds it troubling that in a death penalty case, an alleged crime which has never been adjudicated can be considered in determining whether a defendant should be executed. Any witness willing to risk perjury charges can come forward at the penalty stage to allege a defendant has committed a crime. There is no requirement that the prosecutor corroborate or verify testimony about untried accusations, and alleged crimes are not required to have been investigated, charged, or even reported to the authorities. Prosecution of the alleged offenses could be impossible by the time of a defendant's trial due to lack of evidence or the statute of limitations, yet testimony about such acts is nevertheless allowed.

The United States Supreme Court has ruled that "relevant, unprivileged evidence should be admitted and its weight left to the fact finder, who would have the benefit of cross-examination and contrary evidence by the opposing party," *Barefoot v. Estelle,* 463 U.S. 880, 898, 103 S.Ct. 3383, 3397, 77 L.Ed.2d 1090 (1983), *reh'g denied,* 464 U.S. 874, 104 S.Ct. 209, 78 L.Ed.2d 185 (1983), but this court questions the "benefit" of cross-examination when an alleged crime may never have been reported, much less investigated. Under those circumstances, it could be most difficult to determine whether an al-

---

P.2d 1387, 1388 (1986), *cert. denied,* 479 U.S. 871, 107 S.Ct. 242, 93 L.Ed.2d 167 (1986). South Carolina requires a limiting instruction to be given that the evidence can only be considered as to the defendant's characteristics, not as to proof of the alleged aggravating circumstances. *State v. Skipper,* 285 S.C. 42, 48, 328 S.E.2d 58, 62 (1985), *rev'd on other grounds, Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct.

1669, 90 L.Ed.2d 1 (1986). Illinois requires a cautionary instruction when the evidence is uncorroborated. *People v. Devin,* 93 Ill.2d 326, 348, 67 Ill.Dec. 63, 74, 444 N.E.2d 102, 113 (1982); *People v. Whitehead,* 116 Ill.2d 425, 454, 108 Ill.Dec. 376, 388, 508 N.E.2d 687, 699 (1987), *cert. denied,* 484 U.S. 933, 108 S.Ct. 307, 98 L.Ed.2d 266 (1987). *See also* Smith, 93 Colum.L.Rev. at 1271–77.

leged act even occurred, leaving the defendant with denial as his only available defense.

The Tenth Circuit Court of Appeals recently addressed this issue in *Hatch v. Oklahoma,* 58 F.3d 1447 (10th Cir.1995). In *Hatch* the defendant waived his right to a jury trial, and the finding of guilt and death sentence were decided by district court judges. *Id.* at 1451–52. The Tenth Circuit Court does not set forth the particular uncharged misconduct at issue in that case, so the seriousness of the unadjudicated crimes and any similarity to the crime for which the death penalty was imposed are unknown. Holding that "the admission of evidence of unadjudicated offenses at a sentencing proceeding does not violate due process," the court cites cases from the three other circuits which allow introduction of such evidence regardless of whether the defendant has been convicted of or even charged with an alleged crime. *Id.* at 1465. However, this court finds that there remain constitutional requirements that evidence used in sentencing a defendant be both reliable and free from unfair prejudice.

In *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the United States Supreme Court held that a defendant was denied due process when confidential information in a presentence report was not disclosed to the defendant, but was relied upon, at least in part, in imposing a death sentence. Reiterating that "death is a different kind of punishment from any other," *Id.* at 357, 97 S.Ct. at 1204 (citing *Gregg v. Georgia,* 428 U.S. 153, 181–88, 96 S.Ct. 2909, 2928–32, 49 L.Ed.2d 859 (1976)), the Court expressed concern that "critical unverified information may be inaccurate and determinative in a particular case." *Id.* at 360 n. 10, 97 S.Ct. at 1205 n. 10.

In Part VB of this Order, Penalty Stage/Statutory Aggravators (Notice), this court held that one day's notice of aggravating circumstances was a denial of due process. This court further finds that this evidence was critical to Petitioner's sentencing, and Petitioner's counsel was denied the opportunity to investigate the reliability of the testimony and prepare a defense.

Both Rule 403 of the Federal Rules of Evidence and Okla.Stat. tit. 12, § 2403 allow exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." In *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), *reh'g denied,* 501 U.S. 1277, 112 S.Ct. 28, 115 L.Ed.2d 1110 (1991), the Supreme Court addressed the issue of potentially prejudicial evidence presented in the sentencing phase of a capital case. The Court held, "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* at 825, 111 S.Ct. at 2608. In her concurring opinion, Justice O'Connor elaborated on this issue, writing that due process may be violated, "[i]f, in particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair." *Id.* at 831, 111 S.Ct. at 2612 (O'Connor, J., concurring).

At the time of Petitioner's trial, no charges had been filed with respect to the unadjudicated crimes introduced at the penalty phase, and the statute of limitations had expired on the alleged offenses. *See* Okla.Stat. tit. 22, § 152. As discussed in Part VB of this Order, A.H. testified about an alleged 1981 assault and battery. However, the prosecutor used A.H.'s testimony not only to prove aggravators necessary to impose the death penalty, but also to tie A.H.'s testimony about her facial wounds allegedly caused by Petitioner's horse-head ring to Debbie Carter's injuries. When the prosecutor urged the jury to use their common sense and ask themselves, "[W]ho was the major participant in the death of Debbie Carter," (Tr. 1027), A.H.'s testimony was used to cement the finding of guilt in the first stage of trial. With only one day's notice that A.H. would testify and no notice whatsoever that testimony about the ring and puncture wounds would be presented, Petitioner was unable to defend against this highly prejudicial testimony, rendering the trial fundamentally unfair in violation of the Due Process Clause.

Therefore, this court finds that the use of unadjudicated crimes evidence in Petitioner's

trial violated the guarantee of due process provided by the Oklahoma and United States Constitutions. In addition, this type of evidence injected arbitrariness into the sentencing proceedings in violation of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), *reh'g denied*, 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 163 (1972), and *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

### Avoidance or Prevention of Arrest or Prosecution

■ The jury in Petitioner's case found that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution (O.R. 331, 332). The focus of this aggravating circumstance is the state of mind of the assailant. *Stouffer v. State*, 738 P.2d 1349, 1361–62 (Okla.Crim.App.1987), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988); *Smith v. State*, 737 P.2d 1206, 1216 (Okla.Crim.App.1987), *cert. denied*, 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987). In some cases defendants have admitted that their intent was to silence the witness. *Banks v. State*, 701 P.2d 418, 427 (Okla.Crim.App.1985); *Parks v. State*, 651 P.2d 686, 695 (Okla.Crim.App.1982), *cert. denied*, 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983). In others the State has had to prove it with circumstances. *See Munson v. State*, 758 P.2d 324, 335 (Okla. Crim.App.1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989); *Eddings v. State*, 616 P.2d 1159, 1169 (Okla. Crim.App.1980). In this case, there was no evidence of any statement by Petitioner indicating he killed the victim to avoid being identified later. To the contrary, his alleged admissions, if accepted as true, indicate he raped and killed her because she had previously snubbed him and refused to have sex with him (Tr. 450, 574, 576–577, 601). Such evidence is insufficient to support this aggravating circumstance.[39]

■ The Supreme Court has held that "the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement

for sufficiently minimizing the risk of wholly arbitrary and capricious action." *Maynard v. Cartwright*, 486 U.S. 356, 362, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372 (1988) (citations omitted). The mere fact that a felony was committed in addition to murder does not warrant a finding that the murder was committed to eliminate a witness. This court finds that the evidence used in support of this aggravating factor was insufficient and that it was applied in an arbitrary and capricious manner.

### Sentencing Instructions

■ Finally, Petitioner alleges that numerous sentencing instructions constituted fundamental error in that they restricted or precluded the jury from giving full consideration and effect to mitigating evidence before imposing his death sentence. The State asserts that this is simply a general attack on Oklahoma's uniform jury instructions which have been approved by both the state and federal courts.

■ A state that imposes capital punishment must apply its laws in a manner that directs the sentencer by "clear and objective standards" providing "specific and detailed guidance" and that "make rationally reviewable the process for imposing a sentence of death." *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980) (footnotes and citations omitted). In order to be assured that the sentencer has treated the defendant as a unique human being and that a death sentence is a reliable determination, mitigating evidence must be presented, considered and given effect. *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989). If there is a substantial risk that reasonable jurors could interpret instructions as precluding full consideration of mitigating circumstances, any resulting death penalty must be vacated. *Mills v. Maryland*, 486 U.S. 367, 383–84, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988).

■ A convicted defendant in Oklahoma has the right to have his sentence set by a

---

**39.** The Court of Criminal Appeals upheld this aggravator based solely upon the disputed testimony that Petitioner knew the victim, and the testimony of A.H. who testified about a "prior unadjudicated act." *Williamson*, 812 P.2d at 406.

jury, and the jury must be correctly instructed. *Hicks v. Oklahoma*, 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980). No presumption can be made that the jury understood the charge in a constitutional manner, consistent with the statute. It is well settled that "when there exists a reasonable possibility that the jury relied on an unconstitutional understanding of the law in reaching a guilty verdict, that verdict must be set aside." *Francis v. Franklin*, 471 U.S. 307, 324 n. 8, 105 S.Ct. 1965, 1976 n. 8, 85 L.Ed.2d 344 (1985). "In reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds." *Mills*, 486 U.S. at 376, 108 S.Ct. at 1866.

■ A single jury instruction may not be viewed in isolation, but must be examined in the context with the overall charge. On habeas corpus review a federal court can overturn a state conviction based on improper jury instructions only where the instructions "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

Oklahoma law requires that in the sentencing phase:

> Unless at least one of the statutory aggravating circumstances enumerated in this act is so found or if it is found that any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed.

Okla.Stat. tit. 21, § 701.11.[40]

In Petitioner's sentencing phase the jury instructions read as follows:

> If you unanimously find that one or more of the aggravating circumstances existed

beyond a reasonable doubt, unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances, the death penalty shall not be imposed.

(O.R.Supp. 29).

In *Allen v. State*, 871 P.2d 79 (Okla.Crim. App.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994), the defendant alleged that the same jury instructions as those given in Petitioner's case were a misstatement of the law. The defendant in *Allen* argued that each individual aggravating circumstance must be weighed against the totality of the mitigating circumstances, and if one of the aggravating circumstances is outweighed by all the mitigating circumstances, the jury cannot impose the death penalty. *Allen*, 871 P.2d at 101.

The *Allen* court interpreted the statutory phrase "any such aggravating circumstance" as singular and referring to the preceding phrase "at least one of the statutory aggravating circumstances." Finding "no requirement that each aggravating circumstance must on its own stand against the totality of the mitigating circumstances," the court held such a construction "is not supported by the statute itself." *Id.*

Although the Court of Criminal Appeals pointed out an incorrect method of weighing aggravators and mitigators in *Allen*, it has "refused to ... [establish] specific standards" for a correct method of balancing aggravating and mitigating circumstances. *Williamson*, 812 P.2d at 410. Without explicit guidance from the Oklahoma courts, this court finds there could be at least two other readings of the sentencing instructions at issue.

---

**40.** A survey in 1994 indicated that 21 of the 36 states which sanction the death penalty are considered "weighing" jurisdictions, because the sentencer is required to weigh applicable aggravating factors against applicable mitigating factors. Oklahoma is one of the "weighing" states. Hornbuckle, *Capital Sentencing Procedure: A Lethal Oddity in the Supreme Court's Case Law*, 73 Tex.L.Rev. 441, 462 n. 38 (1994). Under *Zant v. Stephens*, 462 U.S. 862, 890, 103 S.Ct. 2733, 2750, 77 L.Ed.2d 235 (1983), these states are not required "to adopt specific standards for in-

structing the jury in its consideration of aggravating and mitigating circumstances."

In contrast, the federal death penalty statute sets forth the weighing standard whereby the sentencer must "consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e)(3).

One reading of the statute could be that each aggravating circumstance is weighed against appropriate, but not necessarily all, mitigating circumstances. This construction would prohibit imposition of the death penalty if no aggravating circumstances are found, or if *at least one* mitigating circumstance outweighs *any* aggravating circumstance. Under this interpretation, the jury instructions switched the weighing formula by prohibiting imposition of the death penalty unless an aggravating circumstance outweighs at least one mitigating circumstance.

Under such a construction of the statute, if only one of the aggravating circumstances is outweighed by one or more mitigating circumstances, there can be no death penalty. However, under this interpretation the jury instructions reversed the focus so that if any aggravating circumstance outweighs any mitigating circumstance, the death penalty may be imposed. These conflicting foci of the statute and the jury instructions could result in different results under the same fact pattern.

A hypothetical illustration follows: The jury finds there are two aggravating circumstances (A1 and A2) and two mitigating circumstances (M1 and M2). The jury then finds that M1 outweighs A1, and A2 outweighs M2. Under the statute, since M1 outweighs A1, the death penalty shall not be imposed. However, under the jury instructions, since A2 outweighs M2, the death penalty may be imposed. The focus in both the statute and the instructions is on individual aggravating and mitigating circumstances, not the totality of aggravating and mitigating factors. The opposing objects of that focus can result in opposite outcomes.

A second possible construction of the statute is found in *Cartwright v. Maynard,* 822 F.2d 1477 (10th Cir.1987). In *Cartwright* the Tenth Circuit Court of Appeals considered what effect an unconstitutional statutory aggravating circumstance should have upon a jury's verdict. The court ultimately held that where the sentencer balanced the aggravating circumstances with the mitigating circumstances, and one of the aggravating circumstances was unconstitutional, the Eighth and Fourteenth Amendments required vacation of the death sentence. *Cartwright,* 822 F.2d at 1492. In the court's analysis it made the statement that "[t]he sentencer must balance all of the statutory circumstances with all of the mitigating circumstances." *Cartwright,* 822 F.2d at 1480 (citing Okla.Stat. Ann. tit. 21, § 701.11 (1983)). Although the precise issue of ambiguity of the sentencing instructions now before this court was not before the *Cartwright* court, it appears that a reading of the statute consistent with the Tenth Circuit's construction would render Petitioner's jury instructions free from fundamental error. In other words, the instructions would properly reflect the law, and there would be no question of misinterpretation by a jury.

This court concludes that the Tenth Circuit Court of Appeals has addressed the issue of statutory construction, albeit in the form of dicta. Further, a construction in which all the aggravating circumstances are weighed against all the mitigating circumstances is certainly not precluded by the Oklahoma Court of Criminal Appeals' holding in *Allen.* Therefore, this court finds that the jury instructions in Petitioner's case were proper and met Constitutional standards.

### CONCLUSION

In the recent case of *O'Neal v. McAninch,* — U.S. ——, ——, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995), the United States Supreme Court enunciated a new standard applicable to federal court review of a petition for habeas corpus. The Court held that when a federal habeas court finds a constitutional trial error, and it is in grave doubt about whether the error had a "substantial and injurious effect or influence in determining the jury's verdict," the error is not harmless, and Petitioner must win. Due to the magnitude of the constitutional violations in Petitioner's case, viewed either individually or in combination, this court has no doubt that there was substantial and injurious effect or influence upon the jury's verdict.

### EPILOGUE

While considering my decision in this case I told a friend, a layman, I believed the facts and law dictated that I must grant a new

trial to a defendant who had been convicted and sentenced to death.

My friend asked, "Is he a murderer?"

I replied simply, "We won't know until he receives a fair trial."

God help us, if ever in this great country we turn our heads while people who have not had fair trials are executed. That almost happened in this case.

ACCORDINGLY, the Writ of Habeas Corpus shall issue, unless within one hundred twenty (120) days of the entry of this Order the State grants Petitioner a new trial or, in the alternative, orders his permanent release from custody. *See Smith v. Secretary of N.M. Dept. of Corrections,* 50 F.3d at 835.

**IT IS SO ORDERED.**

## APPENDIX

**IN THE COURT OF CRIMINAL APPEALS FOR THE STATE OF OKLAHOMA**

**Case No. F–88–501**

Ronald Keith Williamson, Appellant,

v.

The State of Oklahoma.

STATE OF OKLAHOMA )
) SS
COUNTY OF PONTOTOC )

**AFFIDAVIT OF ANNETTE HUDSON**

I, Annette Hudson, do state upon oath as follows:

1. Ronald Keith Williamson, the Appellant, is my younger brother. His other sister, Renee Simmons, is older than Ron, but younger than myself. We grew up in Ada, Oklahoma, with our mother, Juanita Irene Williamson, and our father, Roy Williamson. As a child Ron was exceptionally bright and seemed to develop rapidly. As he was growing up he was well liked by his teachers and friends. Ron had a talent for sports, especially baseball. However, Ron was hyperactive. He would swing his baseball bat in the house to the point of extreme annoyance. He was always the center of attention and was continually showing off. He was a very demanding child, and usually got what he wanted even though our parents were poor. The family was determined to help Ron with his baseball career. They moved to Asher, Oklahoma, so that Ron could spend his senior year playing for Asher High School. Asher had a very good baseball program, and Ron would have a better chance to be seen by pro scouts if he played there. After he graduated Ron spent some time at college. I cannot remember the details of his college days, but I think that he spent at least a semester at Bacone College. It was during this period of his life that he was drafted by the Oakland Athletics.

2. Shortly after he began his professional baseball career Ron married a very pretty girl who was chosen Miss Ada in a beauty contest. Things seemed to go all right for a while, however soon Ron was getting himself in trouble with his coaches by calling up the head office and complaining when things did not go his way at the farm club where he was playing. He was cut from the Oakland Athletics, and was hired by a farm club for the New York Yankees in Ft. Lauderdale, Florida. However Ron, who was a pitcher, was also having trouble with his arm, and when he was eventually cut from the Yankees this one of the reasons given.

3. Ron's professional baseball career ended in the mid-seventies. Ron was utterly devastated by the loss of his baseball career and has never been the same since. I visited him after this happened and he was so distraught that he cried uncontrollably. Shortly thereafter Ron and his wife moved to Tulsa.

4. During this period of his life Ron had several jobs in the Tulsa area, including a job with Bell Telephone, and at a mens' clothing store. Ron and his wife divorced. My memory of the exact sequence of events is not clear. A year or two after his divorce he was hospitalized, but when mom and I went to see him at the hospital he was very uncomfortable in our presence. The doctor refused to disclose the reason for his treatment. In the late seventies Ron was twice charged with rape in the district court of Tulsa County, and was twice acquitted. The rape trials were another very traumatic experience in Ron's life. Thereafter he left Tulsa and

moved back to Ada where he lived with our parents most of the time.

5. At this point Ron's increasingly strange behavior caused the family to be concerned about his mental health. Ron got in the habit of sleeping for long periods of time, some time as long as twenty hours a day. He began to insist on sleeping on the couch in the living room because he was afraid to sleep in the bedroom during the night. There were occasions when he jumped onto the couch shouting that there were snakes on the floor and spiders on the wall. Ron had great difficulty keeping any kind of a job. Once he went on a trip to Florida with a friend named Bruce Leba supposedly to work construction. A few weeks later he returned, but then left again and went to Los Angeles, California, where he worked at another clothing store. He called home one night sobbing that he was living with some devil worshippers who terrified him. He said that they would not let him leave. Our father sent Ron a plane ticket, and he returned to Ada and lived with mother and father. Soon thereafter our father died. Ron went to New Mexico to find work, and remained there for about a month living with a girl friend. Ron then returned to Ada and lived with mother. We became so concerned with Ron's behavior that we began to look for help. Ron's aberrant behavior caused mother to spend the night away from home on more than one occasion, although mother would never say why.

6. Once I spoke to Judge Ronald Jones, a local district judge in Ada, and Judge Jones informed me that the courts could do nothing about Ron until it could be proven that Ron was either a danger to himself or others. This was the same judge who presided at Ron's murder trial. In 1979 we took Ron to St. Anthony Hospital in Tulsa, Oklahoma, but Ron refused to stay there more than a few days. In addition to his other problems Ron also had a drinking problem and a drug problem. I believe that he has been a patient or at least received counseling at several drug and alcohol abuse facilities, one of them being Valley Hope Association. At some point in this period we consulted Melvin D. Brooking, a family friend who is a Psychological Assistant at Vocational Rehabilitative Services in Pontotoc County. Ron also became involved with Mental Health Services of Southern Oklahoma which has a branch office in Ada, and he continued to receive counseling and treatment in one form or another from that facility during the 1980's. It is my understanding that Ron has also been examined and treated in State hospitals during the 1980's. My memory of the specific dates and times and places is not clear.

7. Ron has been in some situations which could have caused head injuries. Our mother was in her thirties when she carried Ron, and during her pregnancy she slipped and fell. As a small child Ron was severely bow-legged and had to wear corrective shoes. When he was four or five years old he fell out of a moving car. The door came open as mother was making a turn, and Ron fell out of the car and hit his head on the pavement. He did not appear to be hurt so mother did not take him to the hospital. However, I can recall Ron later complaining of headaches. When Ron was older, in his twenties, he was hit over the head with a pool cue stick in a bar fight. It seems like there were other times when Ron got hit in the head, but I cannot remember details because it has been so long ago.

8. I know nothing about Ron's alleged involvement in the homicide of Debbie Carter, except that at the time Ron was living with mother. Soon after the homicide mother told me that Ron could not have done it because he was at home that night. She seemed visibly relieved when she said this, so I always believed her.

9. During the mid 1980's Ron got into trouble with the law in a forgery case, and was convicted and went to prison and had various other problems. Mother died in August of 1985, and Ron was distraught over this event. When Ron got out of prison his appearance had changed drastically. Previously he had been the type of man who was concerned with his appearance. Now he was fat, dressed sloppily, and chain smoked. I do not recall all of the places where Ron might have gone during the years before he was finally arrested for the Carter homicide, how-

ever he did live with me and my husband for a while and also lived with his sister Renee and her husband in Chickasha. During this period Ron could not relax when he was around the family at family gatherings. He would typically become extremely nervous at the table and would get up and leave the room. When he was living with us he would lay on the couch and stare for hours. He talked to himself as if he was answering someone. He acted as though someone was talking to him. On occasions he would become extremely depressed. He seemed to always be unhappy and made everyone uncomfortable. He would make deep sighs and look worried for no apparent reason. One evening Ron went out in the backyard and hugged my son's dog. Then he cried out loudly and ran screaming through the woods in back of our home. When he returned he was calm as if nothing had happened. Ron got a job in Arkansas with a relative named Ed Coddle. Ed had known Ron for years. Before Ron left, my husband sat him down and told him that if he would take the medicine that Doctor Snow, a local psychiatrist, had prescribed, he would be able to function. Ron's answer was that as soon as he left the pills were going to go out the car window because they made him feel like less of a man. Ron stayed in Arkansas for two or three weeks, and then was asked to leave because of unspecified erratic behavior. On the way home Ron bought presents for us. We knew that he did not have money to spend on presents. He came to our house, ate lunch and left to go to Renee's home in Chickasha. Between that time and the time of his arrest Ron was taken on at least one occasion to Central State Hospital in Norman, He was also treated at a hospital in Shawnee, Oklahoma. After his release from there Ron returned to Ada where he lived by himself in a shack that belonged to a friend.

10. After Ron's arrest for the Carter homicide, his condition seemed to worsen. In the jail he did not shave or bathe, and on one occasion I told him that I would not come back to see him if he did not clean up. Ron sometimes became extremely upset in the jail. Once I was called to come down to the jail to calm Ron down. He was screaming and hollering.

11. During the prosecution of this case the social security service awarded Ron a disability for reasons connected to his mental problems. I have had custody of those funds, and have periodically sent money to Ron and made expenditures on his behalf. Mr. W.B. Ward, Ron's court appointed lawyer, did ask me for funds for a defense hair expert. I refused his request because of the things Mr. Ward said about Ron's chances for an acquittal. I have had to be careful with the money that I have given to Ron. He got some of this money when he was in jail awaiting trial, and bought a barbeque dinner for the entire jail.

12. I never spent more than ten minutes at a time with Mr. Ward, and visited with him only on three or four occasions. Once I asked Mr. Ward if it would do any good to have family members testify and he acted as if it would not. I was never asked to testify at Ron's trial, but would gladly have done so if I had been asked.

Further Affiant Sayeth Not.

/s/Annette Hudson
Affiant

Subscribed and sworn to before me this 17 day of October, 1989.

/s/ Dorothy McCabe
Notary

My commission expires: Mar. 5—93

## IN THE COURT OF CRIMINAL APPEALS FOR THE STATE OF OKLAHOMA

### Case No. F–88–501

Ronald Keith Williamson, Appellant,

v.

The State of Oklahoma, Appellee.

STATE OF OKLAHOMA )
 ) SS
COUNTY OF GRADY )

### AFFIDAVIT OF RENEE SIMMONS

I, Renee Simmons, do state upon oath as follows:

1. Ronald Keith Williamson, the Appellant, is my younger brother. Annette Hudson is our older sister. I grew up in Ada, Oklahoma, with our mother and father and

Annette and Ron. I now live in Chichasha, Oklahoma, with my husband, Gary Simmons. Consequently I have not had the constant contact with Ron as Annette, who has remained in Ada. However on occasion Ron has resided with my family and I have seen him on weekends and holidays and family gatherings.

2. As a boy Ron was smart and popular and athletic. He made good grades in school and was very talented at baseball. However as a small child he was hyperactive and very hard to control. He was also very headstrong and prone to throw tantrums.

3. Ron has always been somehow different from other people. However, I did not become concerned about Ron's mental condition after the end of his baseball career and his divorce. Ron could no longer sit down and relax with the family. As soon as he would arrive at a family gathering he would get nervous. His body would shake all over, and often times he would leave the room. His personal appearance declined. Previously he had been particular about his clothes and his grooming, and every now and then he would still make an effort to look sharp. But on the whole he was becoming increasingly sloppy and unkept. On occasions when he stayed at our house in Chickasha he would want to stay up for long hours into the night and sleep mostly during the day. In the day time Ron would stay back in the bedroom by himself, but at night he refused to sleep in the bedroom and insisted on staying on the couch. He would not to eat with us and instead would eat long after we had finished. Ron avoided talking about his drug problem, but he did admit to us that he had taken cocaine and another drug which I believe was PCP. My husband takes pain medication, and one night he caught Ron searching the kitchen for his pills.

4. Ron soon began to manifest more disturbing problems than these. Ron had always been the kind of person who could become absorbed with a particular subject, and had been that way about baseball when he was a child. Later in life he took this habit to extremes with other subjects. Once he became totally fascinated with U.S. presidents, and soon it almost impossible to carry on a conversation with him about anything else. Once Ron became obsessed with guitar playing and would strum for hours. On occasion Ron would become so rapped up in something that he was talking about that he literally could not stop talking. I can vividly remember one instance about five or six years ago when we were visiting our cousin in Jenks, Oklahoma. Ron was also a house guest at the time. During the night Ron's cousin caught him getting some liquor out of the cabinet, and took the bottle away from him and poured it down the sink. The commotion aroused me and others in the house. Ron became upset and walked into the living room and stood in the middle of the floor and began to ramble about his life, starting with his early childhood. He must have talked for at least an hour without interruption. It was as if we were not there. My cousin tried to calm him down but his efforts were fruitless. Ron talked as hard and fast as he could go, shaking his arm for emphasis. Finally he slumped into a chair totally exhausted. I can recall another similar incident that occurred during one of Ron's incarcerations in the county jail in Ada. By that time Ron had become fascinated with the bible. Annette and I had come to visit him, and Ron spoke to us as if we were strangers. He invited us to step right up, acting as if he were some kind of radio broadcaster. He seemed to return to normality when we started talking to him, but then he proceeded to tell Bible stories, and paid no attention to us when we tried to interrupt him. We let him talk until he finally stopped, and then we were able to carry on a normal conversation as if nothing had happened. When Ron lived with mother she told me that he claimed that he was hearing voices that told him that he was bad and would never be any better and to pray and ask the lord to help him clear his mind.

5. Ron was depressed over the down turns in his life. However he never seemed to get over his problems. After his release from baseball he developed the tendency to sit and stare for long periods of time. I could not tell what would trigger this behavior. He could be carrying on a normal conversation and then just stop and stare. Ron was subject to extreme mood changes for no apparent reason. He could be engaged in a

normal conversation with the family and all of a sudden become very upset and walk out of the room without us knowing what had set him off. At other times rather than becoming angry he would become depressed to the point where he would break down and cry. This could happen in the middle of a normal conversation, and it was impossible to tell from one moment to the next whether Ron was going to be happy or down. This pattern had continued to the present. We allow him to call us collect once or twice a month, and sometimes he sounds fine and on other occasions he is irrational. He has a similar tendency with his letters. Some of his letters are normal, whereas others will consist of only one or two lines that are not part of any particular context.

6. It is possible that Ron could have sustained some head injuries as a child. His mother had a bad fall in the kitchen when she was pregnant with Ron, and there was another incident several years later when Ron fell out of a moving car.

7. Ron has been frequently seen by doctors and other professionals. None have been able to improve his condition to any noticeable degree. Mr. W.B. Ward, Ron's trial attorney, never ask me to testify about any of these matters, although I would have been perfectly willing to do so.

Further the Affiant Sayeth Not.

/s/ Renee Simmons
Affiant

Subscribed and Sworn to before me this 17 day of October, 1989.

/s/ Jeanette Curtis
Notary

My commission expires: July 92

**IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA**

**Case No. F–88–501**

Ronald Keith Williamson, Appellant,

v.

The State of Oklahoma, Appellee.

State of Oklahoma )
) SS
County of Grady )

**AFFIDAVIT OF GARY E. SIMMONS**

I Gary Simmons do solemnly state the following information to be true and correct:

I am the brother-in-law of Ronald Keith Williamson. I have known about Ronnie ever since he was a small boy attending my church. I married Renee, Ronnie's youngest sister, March 5th, 1971. When Renee and I first married, Ronnie had just transferred to Asher High School to play baseball. It was his senior year. Ronnie was drafted by the Oakland A's right out of high school. The "A's" gave him a $16,000.00 bonus to sign with them. He was Oklahoma's highest draft pick that year. He was so excited about his contract. Ronnie went out and bought presents for his mom and dad.

Ronnie played for Coos Bay–North Bend, the "A's" farm team in Coos–Bay, Oregon. Renee and I were aware that Ronnie's dad had received phone calls from his coach. The coach was concerned with Ronnie's behavior, but, we were never told anything specific. I can't remember exactly how long Ronnie played pro baseball, but he was eventually cut from the team. Ronnie was devastated. His family had made many sacrifices for him throughout the years so that he could focus on baseball. He thought he had let his family down and felt like he was a failure. Ronnie's emotional problems really began to surface after he was released by the "A's". It was then that Renee and I first realized that his problems were serious.

Ronnie moved back to Oklahoma and had gotten a job in Tulsa as a sales or promotional representative with Bell Telephone Company. He was married to former Miss Ada, Patty O'Brian. Renee and I went to Tulsa for our friend's wedding and we stayed with Ronnie and Patty. Ronnie was very agitated and nervous. He paced around the house continuously for sometime. Then, he just up and left without saying a word to anyone. Patty was very upset of course. She told us that Ronnie had done the same thing on other occasions. There was another time

when Ronnie and Patty came to stay with Renee and I. Ronnie and I went to see a movie. All Ronnie could talk about the whole time he was at our house was the movie we saw. He still mentions that movie to this day.

From the point I knew Ronnie as an adult I can truthfully say he seemed to have an obsessive personality. He seemed as though he always had just one main focus in his life. He became totally immersed in whatever he was focused on to the point of excluding everything else around him. Ronnie always expected everyone he knew to be as obsessed as he was about whatever it was he was interested in.

Ronnie and Patty eventually got a divorce and he moved back to Ada. Renee and I were living away from Ada at this point in time, so our contact with Ronnie was sporadic. Still, Renee and I could tell he was getting worse. I remember at family gatherings such as birthdays, anniversaries, reunions, and at holidays like Christmas and Thanksgiving that Ronnie would do two things I thought was very strange. He would stay in a room by himself with the door closed, then come out shouting, ranting, and raving about something totally different from what we were all doing at the time. He would want us to be involved in whatever idea it was he happened to have. For instance, there was one Christmas when Ronnie burst into the room where the rest of us had been enjoying each other's conversation. He sat down on the floor and started playing his guitar. He demanded that we all sing. Suddenly, he just got up and went to his room and closed the door. We all looked at each other and just rolled our eyes.

Another example of his obsessiveness is when Ronnie was working at a men's clothing store. He would constantly tell you how to dress, what tie was in or out, and always dressed in the latest fashions available to him.

There was another particular incident at my house in Chickasha. Several of us were sitting in the living room engaged in typical family conversations. Ronnie went to the bathroom, and when he came out he started shouting, rambling on about religion. He was incessant about it. Nothing he said made any sense to us. This behavior was typical of Ronnie by this point in time. His strange behavior made him the center of attention whenever he was around. It was very hard on the family, and everyone else around him.

Prior to Ronnie going to prison in 1985 he had been staying with his sister Annette in Ada. Things had diminished to the point that Annette's husband, Marlon, told Ronnie he had to leave. He was at our house in Chichasha one day when we came back from church. He had been sleeping out behind our back yard fence and came around to the front when he heard us drive up. Ronnie told us he had just escaped from some Army guys down in Lawton where he evidently had been staying. He told us they had guns and explosives in their homes and that they were planning to overthrown the base. It seemed liked Ronnie always ended up in Lawton whenever there was no place else for him to go. We didn't have relatives that lived in Lawton. We never knew where he stayed in Lawton, or who his friends were. Ronnie wanted to stay with Renee and I until he found a job there in Chickasha. I let him have my son's room. He found a job hauling hay for a man over in Alex, Oklahoma. The job lasted about two days. Ronnie came in and said he had found a softball team to play on. A few days after that the man that organized the team, Floyd Reed, called and told me Ronnie wasn't welcome. Floyd said Ronnie had some serious emotional problems.

Ronnie became obsessed with former Presidents when he was staying with us. He read and studied and talked about Presidents all the time. Ronnie would tell you more than you wanted to know about Presidents.

Ronnie was basically nocturnal at this point. He wouldn't, or, couldn't sleep at night. He would stay up all night in the living room with the television on. Ronnie would only go to bed when the sun started to come up. One night I found him in our bathroom prowling around in the medicine cabinet. I asked him what he was doing and

he said that he had a bad headache and was looking for something to take. Ronnie complained of headaches often.

Ronnie's eating habits were strange also. He ate like a voracious animal with an insatiable appetite. It was like he was afraid he would never get another meal.

I finally sat Ronnie down and told him if he was going to stay in my house he had to follow the same program the rest of my family had. Get up in the morning and sleep at night. Ronnie, at this point, showed no signs that he had any insights into his problems. He said he had medical problems like mono, or encephalitis, and that it affected his appetite. His behavior began to seriously effect my family and I had to tell him to leave.

Ronnie was under house arrest in 1985 for illegally obtaining $300.00 dollars from the local college in Ada. They threw him in jail for not being home one night when they came by to check on him. It was about a week before his mother died. She was real bad off at this point and I had to go down to the jail to prepare him for the event. The jailers wouldn't let either of Ronnie's sisters go back to his cell to see him. However, they did let me go back to his cell. I looked through the small opening in the door of his cell. Ronnie was standing nude with his back to the door. I called out to him three times and did not get a response. All of a sudden he turned around and started shouting at me. He was very abusive and he threatened to kick my a—. This was way out of character for Ronnie as he had always shown respect for me in the past. The jailer came and made me leave.

I have taken Ronnie to Central State Hospital on at least two occasions, and I arranged for him to be accepted to the "Teen Challenge" program with the help of our local minister. It's been so long ago, and the weird behavior was so frequent, I can only recall the second incident that precipitated me taking Ronnie to Central State. The doorbell rang and I answered the door. Ronnie came in and collapsed on my living room floor. Two of my friends were there he didn't even know. The first words out of Ronnie's mouth was, "I need help." He was unshaven and his hair was matted and unkept. His clothes were dirty and wrinkled. Ronald was very disoriented. He said, "I need help, I'm crazy," "I just can't take it anymore." At first he was appeared very agitated and fidgety. Then he became lethargic almost catatonic, like he was drifting in and out of consciences. I told him to hang on and we would get him some help. One of my friends went with me, and we drove him to the Grady County Memorial Hospital. They referred us to Grady County Health Department, who in turn told us to take Ronnie to Central State Hospital in Norman, and check him in. On the way to Central State Hospital Ronnie told me he was hungry and needed something to eat. I drove him to place where they give a you a extra large portion of ribs and side dishes. As soon as we pulled into the parking lot Ronnie looked at me and asked where we were. I told him we were going to get him something to eat. He said he wasn't hungry, so I went on. He acted very frustrated and agitated when I told him he had said he was hungry. After we left the rib place, Ronnie again said that he was starving. I pulled in the to McDonald's on the turnpike. As soon as were we stopped Ronnie asked what we were doing. I told him we were getting him something to eat. He said he wasn't hungry and to hurry on to the hospital. This happened again when we got to Norman. Finally I stopped at the Vickers Gas station on Main Street in Norman and bought him a couple of candy bars. He devoured them in a matter of seconds. It was unbelievable, how fast he ate the candy bars.

When we arrived at Central State Hospital a doctor came out to see Ronnie. Ronnie was drifting in and out and the doctor couldn't get any cooperation from him. I had to admonish Ronnie to get him to cooperate. It was like he was a very small child who was scared. After the Doctor left the room Ronnie went over and faced a blank wall. He assumed a rigid, body builder like, pose. He just stood there looking at the ceiling, not moving a muscle or making a sound. It was a long time before Ronnie came out of it, maybe as long as twenty to

thirty minutes. I attempted to talk to him but I got no response. Eventually some of the staff came in and took him to his room. Ronnie checked himself out, against the advice of the hospital. They couldn't keep him against his will because he was there voluntarily.

This last time I took Ronnie to Central state I became aware of the Teen Challenge Program. It's a program designed to help ex-cons, alcoholics, and drug addicts. The program is church orientated. Our pastor is the divisional administrator for the program. I talked with our pastor and he agreed to get Ronnie admitted. The pastors real observation was that Ronnie had problems that the program couldn't help him with. The pastors comment was, "Ronnie's lights are on, but no one's home." We made an appointment for Ronnie to go to Dallas anyway, and he enter the program there. Ronnie was taking lithium at this time. Because the program is church based they didn't allow anyone to have medications, cigarettes, alcohol, and unknown to me they were not allowed to have money. After Ronnie was checked in I was preparing to leave. I gave Ronnie $50.00 dollars in case there was something he needed. Ronnie bought a bus ticket and was back in Ada the next day.

These incidents happened frequently, and had been occurring for at least ten years that I know about. No matter what avenue we tried we just couldn't get Ronnie institutionalized long enough for him to get effective help. I was never asked by Barney Ward to testify at Ronnie's murder trial. I didn't know that I could testify. Had I been asked to do so I would have certainly done it.

/s/ Gary Simmons
Gary Simmons

Subscribed and Sworn to before me this 8th day of October, 1989

/s/ Joseph D. Ward
Notary Public

My Commission Expires:
February 23, 1992